1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF PUERTO RICO

3

4   UNITED STATES OF AMERICA,    )
                                 )
5                   Plaintiff,   )  Case No. 17-498
                                 )
6            vs.                 )
                                 )
7   JOSEAN DOMENECH-ROBLES,      )
                                 )
8                   Defendant.   )

9

10        TESTIMONY OF EDUARDO HERNÁNDEZ QUIÑONES

11      BEFORE THE HONORABLE JAY A. GARCIA-GREGORY

12             MONDAY, JULY 23, 2018

13             HATO REY, PUERTO RICO

14

15  APPEARANCES:

16  FOR THE PLAINTIFF:        OMAR A. BARROSO
                              TIMOTHY R. HENWOOD
17                            **ASSISTANT U.S. ATTORNEYS**

18

19  FOR THE DEFENDANT:        JUAN J. MICHELEN
                              LAUREN E.S. ROSEN
20                            **ASSIST. FEDERAL PUBLIC DEFENDERS**

21

22  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
23  _____
                    ZULMA M. RUIZ, RMR
24            Federal Official Court Reporter
                    150 Carlos Chardón
25              Hato Rey, PR  00918

1    * * * * * * * * * * * * * * * * * * *

2    **THE COURT:** Very well. So now we will start with the

3    witnesses that the Government is going to bring, and I

4    remember, I have to remind you what I told you, okay, the

5    defendant is presumed innocent unless he's proved guilty

6    beyond reasonable doubt. The Government has the burden of

7    proof.

8        So I would like for the Government to call the first

9    witness.

10   **MR. BARROSO:** Yes, Your Honor. The Government would

11   like to call Eduardo Hernández Quiñones to the stand.

12   **THE CLERK:** Raise your right hand, please.

13   **EDUARDO HERNÁNDEZ QUIÑONES, GOVERNMENT WITNESS, SWORN IN**

14   **THE COURT:** Please tell the witness to speak into the

15   microphone so we can all hear him.

16   **MR. BARROSO:** Permission to examine the witness.

17   **THE COURT:** Yes.

18                    DIRECT EXAMINATION

19   **BY MR. BARROSO:**

20   **Q.** Good afternoon, sir.

21   **A.** Good afternoon.

22   **Q.** Please state your name for the record.

23   **A.** Agent Eduardo Hernández Quiñones.

24   **Q.** Agent, how long have you worked for the Puerto Rico Police

25   Department?

1  **A.** Ten years.

2  **Q.** And in those ten years, what divisions have you worked at?

3  **A.** I have been in some precincts, at units such as Tactical

4  Operations, and other units having to do with interventions.

5  And right now, in the Carolina Motorized Unit.

6  **Q.** How long have you worked for the Carolina Motorized Unit?

7  **A.** Approximately five years.

8  **Q.** Before you became a police officer, what did you do?

9  **A.** Once I finished my bachelor's degree in education, I spent

10 a year performing as a teacher.

11 **Q.** So you have been assigned to the Carolina Motorcycle Unit

12 for a while now?

13 **A.** Correct.

14 **Q.** What are the functions of that particular unit?

15 **A.** The specific functions are to provide preventive patrol in

16 areas of high criminal incidence and help enforce the laws of

17 the Commonwealth of Puerto Rico.

18 **Q.** Are you familiar with the facts of an investigation to an

19 individual by the name of Josean Domenech Robles?

20 **A.** Correct.

21 **Q.** Why are you familiar with the facts of this investigation?

22 **A.** Because I was the intervening agent in the case of August

23 of last year.

24 **Q.** And can you please tell the ladies and gentlemen of the

25 jury what exactly happened at around 9:20 p.m. on August 11th,

EDUARDO HERNÁNDEZ – (DIRECT)

1  2017, that brings us before them today?

2  **A.**  Well, that day, almost at the end of the shift, at around

3  9:20 in the evening, we were gathered in a meeting together

4  with the two sergeants.  There was one sergeant in charge of

5  the shift; the other sergeant is the precinct commander.

6  **Q.**  You said that you were all together, you used the word

7  *reunidos*, you were meeting.  Where were you meeting?

8  **A.**  We were in a meeting at the entrance of the Sabana Abajo

9  Public Housing Project.

10  **Q.**  Is there a police precinct around there?

11  **A.**  No.

12  **Q.**  Then why were you meeting there?

13  **A.**  By instructions of our supervisor because we were

14  tendering what we had done during the shift, the work

15  performed.

16  **Q.**  Why would you do that -- why would you do that there, at

17  that particular spot?

18  **A.**  Well, that's an area of high criminal incidence, and so

19  the sergeant gathers us there so that they can all see that

20  there is quite a police presence in the area.

21  **Q.**  So then tell us what happened while you were there.

22  **A.**  Once I was there and I had tendered the work performed

23  during that day --

24  **Q.**  Before you go on, what was your shift for that day?

25  **A.**  We had a special shift that started at 2 in the afternoon

 1  and was to end at 10 in the evening.

 2  **Q.**  You may continue.  You were there to hand in papers for

 3  your shift.

 4  **A.**   Once I had already tendered the work performed, I was

 5  observing towards the entrance of the housing project, and I

 6  observed a black-colored vehicle, which specifically was a

 7  Toyota Solara, that went into the housing project.  As soon as

 8  it went in, it made a U-turn, and at that time I observed that

 9  the windows of the vehicle, the glass, the windows, were quite

10  dark to such an extent I was not able to observe how many

11  individuals, how many persons were inside it.

12  **Q.**  That caused attention to you why?

13  **A.**  It called my attention because that's a violation of the

14  law.  According to Law 22 of the traffic law of Puerto Rico,

15  we had the instrument that we use to measure the tint of these

16  windows, and yours truly, being trained in the use of that

17  instrument, I decided to get on my motorcycle and I notified

18  the sergeant that I was going to go and stop the vehicle

19  because of that violation of law.

20  **Q.**  Okay.  So how familiar are you with the area around the

21  housing project?

22  **A.**  Quite familiar.

23  **Q.**  Why?

24  **A.**  It's an area that we patrol frequently.  In addition to

25  that, because of the events that occurred that evening, we

1  studied the area where the events occurred.

2  **Q.** If I were to show you an aerial view of the area, of the

3  surrounding area, would you be able to identify it?

4  **A.** Of course I can.

5  **MR. BARROSO:** I would like to mark this ID No. 1 for

6  the Government.

7  **BY MR. BARROSO:**

8  **Q.** Agent, can you please look at what is being shown on the

9  monitor.

10  **A.** Correct.

11  **Q.** Do you recognize it?

12  **A.** Correct.

13  **Q.** Why do you recognize it?

14  **A.** Because that was the area specifically where the events of

15  that evening occurred.

16  **Q.** Have you seen this specific picture before?

17  **A.** Correct.

18  **Q.** Where?

19  **A.** When we were talking and studying about the case, that's

20  when I saw it, on the Goggle maps.

21  **MR. BARROSO:** Your Honor, we move for this to be

22  marked as Exhibit No. 1 for the Government.

23  **MR. MICHELEN:** No objection, Your Honor.

24  **THE COURT:** Very well. Exhibit No. 1 for the

25  Government.

EDUARDO HERNÁNDEZ – (DIRECT)

1  **BY MR. BARROSO:**

2  **Q.**  Agent, referring to the picture, can you please point out

3  where it was that you were initially stationed when you were

4  changing shifts?

5  **A.**  Correct, I was in this area particularly.

6  **Q.**  If you touch the screen, it will show.

7     Please make a circle around the area where you were

8  standing.

9  **A.**  (Witness complies.)

10  **Q.**  Can you show the ladies and gentlemen of the jury?  Where

11  exactly the car did the U-turn and left the area?

12  **A.**  The vehicle was coming on from this direction, and it goes

13  into the housing project and it immediately made a U-turn, and

14  then it went out.

15  **Q.**  How many cops would you say were at that shift change in

16  front of that school?

17  **A.**  About six.

18  **Q.**  So how long did it take you, from the time that the car

19  did the U-turn and left the area, until you were able to get

20  on your motorcycle and pursue them?

21  **A.**  I would say about some 40 to 50 seconds.

22  **Q.**  So what happened once the chase ensued?

23  **A.**  Once the vehicle went out, that I got on my motorcycle and

24  I started following the vehicle, the vehicle was approximately

25  three or four vehicles ahead of me.  I turned on the bike

EDUARDO HERNÁNDEZ - (DIRECT)

1  lights, the blue lights, and I turn on the siren indicating to

2  the driver of the vehicle to park to the right in order to

3  start with the intervention.

4  **Q.**  Did the car comply?

5  **A.**  No.

6  **Q.**  What did it do?

7  **A.**  It continued forward.  I'm going to touch here to point

8  towards where.  It continued its path towards all along this

9  road, not complying at all with the indications to stop.

10  **Q.**  While you were traversing this road, did you give more

11  than one command for the vehicle to stop?

12  **A.**  Correct.  We sounded the siren several times and the light

13  were lit.

14      In addition to that, I have the habit that when I'm going

15  to stop a vehicle with the motorcycle, in addition to turning

16  on the lights and turning on the siren, I tend to signal to

17  the driver of the vehicle with my right hand a signal to park

18  to the right.

19  **Q.**  So did you do that in this particular case?

20  **A.**  That's right.

21  **Q.**  What would you say was the speed that this pursuit was

22  held at?

23      **MR. MICHELEN:**  I'm going to object, lack of

24  foundation as to how he would know the speed of a vehicle, and

25  lack of personal knowledge.

1    **MR. BARROSO:**  Well, Your Honor, I'm asking about the

2 speed he was going, not the speed the other vehicle was going.

3    **THE COURT:**  Approximately what was the speed?

4 **BY MR. BARROSO:**

5 **Q.**  Do you know?  Do you remember?

6 **A.**  I really didn't have a chance to see the speed on my bike.

7 **Q.**  So what happened when the vehicle got to the intersection?

8 **A.**  Once it reached the intersection, it turned right.  And

9 once it turned right that I also was able to turn right --

10 **Q.**  Before you keep going, how far back were you at the moment

11 that the vehicle did the right turn?

12 **A.**  Approximately a distance of a car and a half.

13 **Q.**  So what happened then?

14 **A.**  So once I turned right also, I observed this same vehicle

15 that was in front of the second residence, it wasn't stopped,

16 it was driving very slowly.  And I observed that the right-

17 hand passenger vehicle door opened up and out came from the

18 vehicle an individual with a gray shirt, of whom I was only

19 able to see his back; with his right hand, he threw towards

20 the garden of the residence a nickel-colored, silver-colored

21 firearm, and it fell inside the garden of the residence.

22 **Q.**  Where were you exactly when you were able to see this?

23 **A.**  I was behind the vehicle, and I would say that by then I

24 was less than half a vehicle in distance.

25 **Q.**  So when you saw the gun being thrown, what did you do?

EDUARDO HERNÁNDEZ - (DIRECT)

1    **A.**   The vehicle continued its path, and I proceeded on the

2    police radio to notify the sergeant, the sergeant on duty,

3    Sergeant Marcano, that the passenger had thrown a firearm at

4    the second residence, towards the garden of the second

5    residence.

6    **Q.**   So what did the car do after it threw the gun?

7    **A.**   It continued its path and yours truly continued sounding

8    the siren, and it stopped several houses further ahead.

9    **Q.**   Can you mark with an X on the photo where exactly was the

10   gun thrown?

11   **A.**   (Witness complies.)

12   **Q.**   Can you put an arrow where the car finally stopped?

13   **A.**   Can I put in an X or a circle where it finally stopped?

14   **Q.**   Yes, that's fine.

15   **A.**   It stopped here approximately.

16   **Q.**   So once it stopped, what happened?

17   **A.**   I quickly got off the motorcycle.

18   **Q.**   Who was with you by that time?

19   **A.**   Once I got off my motorcycle and I went toward the

20   vehicle, I observed my co-worker, Agent Ivan Marrero, who was

21   on the side of the vehicle, toward the right side.

22   **Q.**   Who got there first?

23   **A.**   Yours truly.

24   **Q.**   So tell us about what happened.

25   **A.**   Once I got off the motorcycle, I approached the driver's

EDUARDO HERNÁNDEZ - (DIRECT)

1   side door, and I quickly told the driver to show me his

2   license and registration.  And I asked the passenger, who is

3   the individual who I had observed that had thrown out the

4   firearm, what was it that he had thrown out.

5       And he himself answered that it was a beer.

6   **Q.**  So what did you proceed to do at that point?

7   **A.**  Since I had seen that what he had thrown out was a

8   firearm, I asked the driver and the passenger to get out of

9   the vehicle and that they were going to be placed under

10  arrest.

11      I asked fellow officer Marrero to assist me with the

12  arrest of the passenger, and they were read their Miranda

13  rights, which are the rights that we always read to them.

14  **Q.**  Can you describe the attire that the passenger was wearing

15  when you stopped the vehicle?

16  **A.**  The most I recall is the gray-colored shirt because that's

17  what I saw the most when I saw him throw out the firearm, and

18  that is what impacted me the most of his clothing.

19  **Q.**  If I were to show you a picture of the moment of the

20  arrest, would you be able to recognize it?

21  **A.**  Correct.

22       **MR. MICHELEN:**  Your Honor, I'm going to object at

23  this point, because it was moved now.

24       **THE COURT:**  You're objecting to what?

25       **MR. MICHELEN:**  I'm assuming the Government is going

1  to try to introduce it as evidence like that?

2       **MR. BARROSO:**  Yes.

3       **THE COURT:**  You're objecting to this?

4       **MR. MICHELEN:**  I'm objecting to once it was removed,

5  now it's unclear whether -- the markings were moved.

6       **MR. BARROSO:**  Your Honor, I understand the objection.

7  I moved it too soon.

8       I can ask the witness to do the markings again, if

9  that will allay the defense.

10 **BY MR. BARROSO:**

11 **Q.**  Can the witness take a look at the image on the screen?

12 **A.**  Correct.

13 **Q.**  I ask you, are the markings placed where you placed them

14 earlier?

15 **A.**  Correct.

16      **THE COURT:**  Very well.

17      **MR. BARROSO:**  Your Honor, can we print this out and

18 mark it as Exhibit 1A for the Government?

19      **THE COURT:**  Yes.

20 **BY MR. BARROSO:**

21 **Q.**  Agent, do you recognize what is on the screen right now?

22 **A.**  Correct.

23 **Q.**  *Porque reconoce usted eso*?

24      I'm sorry.  Why do you recognize that?

25 **A.**  I recognize it because this is a photograph of the place

1   where the vehicle was stopped.  That is the vehicle that I

2   stopped that night, and the person who is to the right with

3   the gray shirt was the individual who threw out the firearm.

4   **Q.**  Who is the person who has the orange?

5   **A.**  The -- the driver of the vehicle that evening.

6   **Q.**  So how does this picture compare to what happened that

7   night?

8   **A.**  It's an exact photograph.  It's the same one that I took

9   that evening.

10          **MR. BARROSO:**  Your Honor, we'd like for it to be

11  marked as Exhibit No. 2 for the Government.

12          **MR. MICHELEN:**  No objection.

13          **THE COURT:**  Very well.  Exhibit No. 2 for the

14  Government.

15  **BY MR. BARROSO:**

16  **Q.**  Before we go on, how was the lighting that night?

17  **A.**  It was lit, as you can see from the photograph, all of the

18  light posts were lit, so it was lit that evening.  In addition

19  to that, this is prior to Hurricane Maria, so there was quite

20  enough electricity.

21  **Q.**  And who was the officer standing behind the individual in

22  the gray shirt?

23  **A.**  My co-worker, Agent Ivan Marrero.

24  **Q.**  So after you had arrested both individuals, what happened?

25  **A.**  As you can see on the photograph, Agent Marrero had kept

1 custody of the individuals.  There were other fellow officers

2 who had also arrived at the scene.  And yours truly, I got

3 back on my motorcycle and I went back toward the site where

4 the firearm had fallen.  And at that site, there was Sergeant

5 Marcano who had preserved the evidence, he was there

6 preserving the evidence.  So I proceeded to take photographs

7 of the evidence and to lift the evidence.

8 **Q.**  If I were to show you said photograph, would you be able

9 to identify it?

10 **A.**  Correct.

11      **MR. BARROSO:**  We would like for this to be marked ID

12 No. 3 for the Government, Your Honor.

13 **BY MR. BARROSO:**

14 **Q.**  Agent, do you recognize what you're looking at on the

15 monitor?

16 **A.**  Correct.

17 **Q.**  Why can you recognize it?

18 **A.**  That was the second residence, where the individual had

19 thrown the firearm, and you can also see the firearm that he

20 threw out that fell in the garden of the residence.

21 **Q.**  About that residence, do you know if it was empty or was

22 it occupied?

23 **A.**  It did not seem like an abandoned house, but no one ever

24 came out of the house or anything.

25 **Q.**  I ask you, Agent, why did you not stop at the moment that

1  you saw the vehicle throw the gun, to take custody of it at

2  that point?

3  **A.**  At the moment that I left the housing project to intervene

4  with this vehicle, I knew that my fellow officers that were

5  there with me were going to come after me.  That's what we

6  always do, we support each other in all interventions.  And

7  since I knew that they were coming behind me, I knew that one

8  of them was going to take custody of the evidence.

9  **Q.**  So what happened to the gun?

10 **A.**  Well, when the firearm, yours truly saw it and recovered

11 it, I observed that it was a Smith & Wesson weapon, 5906, 9mm

12 caliber.

13 **Q.**  What is that 5906 number?

14 **A.**  There is the Smith & Wesson make, and the model, 5906; 9mm

15 caliber.  It was loaded, and the serial number was obliterated

16 in such a way that you could not see the serial number.

17 **Q.**  If I were to show you the gun that you seized that night,

18 would you be able to identify it?

19 **A.**  Correct.

20       **MR. BARROSO:**  Your Honor, we'd like this marked as

21 Government's Identification No. 4.

22       May I approach the witness, Your Honor?

23 **BY MR. BARROSO:**

24 **Q.**  Showing the witness Government ID No. 4.

25    Agent, what is that that you're holding in your hand?

1    A.  The firearm involved in the case that we are discussing.

2    Q.  And how do you know that that particular weapon is the

3    same one that you seized from the scene of the crime that

4    night?

5    A.  It's the same model, caliber, but in addition to that, it

6    has the serial number obliterated.

7    Q.  Can you show it to the ladies and gentlemen of the jury?

8    A.  (Witness complies).

9    Q.  How does that particular weapon that I'm showing you

10   compare to the one that you seized from the crime scene that

11   day?

12   A.  It's the same one that I seized that evening.

13        MR. BARROSO:  Your Honor, we'd like for it to be

14   marked as Government's Exhibit No. 4.

15   BY MR. BARROSO:

16   Q.  That gun that you found there that night --

17        THE COURT:  Government's Exhibit No. 4.

18   BY MR. BARROSO:

19   Q.  -- in what condition was it in?

20   A.  In addition to it having the obliterated serial number, it

21   was loaded.

22   Q.  Do you remember how many rounds were in the firearm?

23   A.  If memory doesn't fail me, it had 13 munition.

24   Q.  Did you find anything else in that area that night?

25   A.  Correct.

1    **Q.**  What did you find?

2    **A.**  A black-colored cell phone.

3    **Q.**  Where exactly did you find it?

4    **A.**  In the place where the firearm was but further on to the

5    right with regards to this photograph that we are looking at.

6    **Q.**  Is it shown in the picture?

7    **A.**  Not the cell phone.

8    **Q.**  Can you please mark at around what area was it found in

9    the picture?

10   **A.**  Correct.  (Witness complies.)

11       Maybe further back.

12   **Q.**  I need you to be as exact as --

13          **THE CLERK:**  Let me clear it.

14          **MR. BARROSO:**  Please clear it.

15          **THE WITNESS:**  (Witness makes marking.)

16   **BY MR. BARROSO:**

17   **Q.**  So who in fact seized the gun that day?

18   **A.**  Yours truly.

19   **Q.**  I assume the police of Puerto Rico have a technical

20   services division?

21   **A.**  Correct.

22   **Q.**  And they are the ones that usually collect evidence from

23   crime scenes?

24          **MR. MICHELEN:**  Object to leading, Your Honor.  He's

25   leading the witness, Your Honor.

1    **THE COURT:**  It's overruled.

2  **BY MR. BARROSO:**

3  **Q.**  So why did you -- why were you the one who seized the

4  weapon and not the technical services division that night?

5  **A.**  We were at the area of the Sabana Abajo Housing Project,

6  that is an area of high criminal incidence.  The vehicle was

7  going to go into that housing project, therefore, for the

8  safety of all of us, in addition, it was 9:20, 9:25 in the

9  evening, we decided not to wait for technical services.  Yours

10  truly took the photographs and I lifted the evidence.

11  **Q.**  How did you preserve the evidence?

12  **A.**  Once I pick up the firearm and I picked up the cell phone,

13  I put them in my motorcycle's briefcase, and I locked the

14  case.  I locked it and I left it there until we reached the

15  motorized unit.

16  **Q.**  So after you seized the gun, what happened then?  After

17  you seized the gun and the cell phone, let me clarify, what

18  happened afterwards?

19  **A.**  Some fellow officers who had arrived in a patrol car did

20  the favor of transporting the arrestees.  The tow driver of

21  the police who arrived quite quickly to the area, lifted the

22  vehicle, but we were already on our way with the arrestees in

23  the patrol car that was taking them to the Motorized Unit

24  station in Carolina.

25  **Q.**  So once you got there, what happened?

1  **A.**  Once we arrived there, yours truly took the information

2  from the arrestees.  In addition to that, we took the full

3  information of the firearm.  I asked the arrestee who was the

4  one that I had observed had thrown out the firearm, with the

5  gray-colored shirt, who the cell phone belonged to, and he

6  told me that it was his cell phone.

7     Afterwards, with the driver of the vehicle, we went

8  towards where the vehicle was, where our unit was, and we did

9  the tinted test with the photometer, which is the instrument

10 that we use, and it gave a result of 14 percent.  Fourteen

11 percent is below the limit established by Law 22.

12 **Q.**  Which is what?

13 **A.**  It's supposed to give a result of 35 percent up.

14          **THE INTERPRETER:**  Or up, correction.

15 **BY MR. BARROSO:**

16 **Q.**  You said that you used a photometer to measure the tint.

17 **A.**  Correct.

18 **Q.**  Do you have to have any type of special certification in

19 order to operate that equipment?

20 **A.**  Correct.

21 **Q.**  What is it?

22 **A.**  It is a certification granted by the traffic bureau where

23 you have to take a course of one full day, and after that day,

24 they certify us as photometer operator, and this is a lifelong

25 certification, it has no expiring date.

1  Q.  And how long have you been certified in using this

2  equipment?

3  A.  About, around eight years.

4  Q.  So regarding that traffic infraction for the tinted

5  windows, were any citations or anything done about that?

6  A.  Correct.  To the driver of the vehicle, we issued a ticket

7  for a violation of Article 10.05 of Law 22 that establishes

8  that tints have to have a measurement of 35 and above.

9  Q.  If I were to show you the ticket that was emitted that

10  night, would you be able to recognize it?

11  A.  Correct.

12      MR. MICHELEN:  Your Honor, our only objection at this

13  point is that this is irrelevant.

14      MR. BARROSO:  We submit that it's not irrelevant,

15  Your Honor, at all.  It goes to the crux of the matter.

16      THE COURT:  It goes to why the vehicle was stopped.

17      MR. BARROSO:  Exactly, Your Honor.

18      THE COURT:  Overruled.

19      MR. BARROSO:  We'd like this to be marked as

20  Government's ID No. 5.

21  BY MR. BARROSO:

22  Q.  Agent, do you recognize what is on the monitors at this

23  moment?

24  A.  Correct.

25  Q.  What is it?

1   A.   It's a ticket for an administrative fault -- offense,

2   correction.

3        MR. MICHELEN:  Your Honor, at this point we believe

4   it should be clarified that is just the translation.  If

5   anything, the actual copy of the ticket should also be

6   included.

7        MR. BARROSO:  Yes.  Can that be marked as Exhibit 5

8   at this time?

9        THE COURT:  Okay, Exhibit 5.  There's a translation?

10       MR. BARROSO:  Yes, that is the translation.  It's a

11  certified translation, Your Honor.  The certification is on

12  the back.

13       We would like this next exhibit to be marked 5A, it's

14  the original.

15  BY MR. BARROSO:

16  Q.   Agent, do you know what that is?

17  A.   Correct.

18  Q.   What is it?

19  A.   The ticket for administrative offense that yours truly

20  issued that evening.

21       MR. BARROSO:  Your Honor, we'd like that marked as

22  Exhibit 5A.

23       THE COURT:  Okay.

24  BY MR. BARROSO:

25  Q.   So, Agent, after you seized the gun and you did the

1  inventory of the vehicle and you did the photometer analysis,

2  were there any other analysis done on the weapon that was

3  seized?

4  **A.**  We did not right there.

5  **Q.**  Were there any analysis ordered relating to that weapon

6  that was seized; fingerprints, DNA, anything like that?

7  **A.**  Not on our part, not on the part of the Puerto Rico

8  Police, no.

9  **Q.**  And why not?

10  **A.**  Well, at least to search for prints or any other test, the

11  person has to have a doubt as to who it was that had thrown

12  out the weapon.  But since I had no doubt that the weapon had

13  been launched by the passenger who had the gray-colored shirt,

14  I did not understand that it was necessary to perform any

15  test.

16  **Q.**  What was the name of the passenger that was arrested that

17  night?

18  **A.**  His name is Josean and his last names are Domenech Robles,

19  or I don't know if it's Robles Domenech, but those are the two

20  last names.

21  **Q.**  Agent Hernández, I ask you, before that night, had you

22  ever seen the defendant before?

23  **A.**  No, never.

24  **Q.**  Did you know who he was?

25  **A.**  No.

EDUARDO HERNÁNDEZ – (DIRECT)

1   Q.  Do you see him in court here today?

2   A.  Correct.

3   Q.  Could you please point him out to the jury?

4   A.  He is at that table, if we're looking at it from left to

5   right, the second one, the one who has the headphones.

6       MR. BARROSO:  We'd like the record to show that the

7   witness has identified the defendant.

8       THE COURT:  Very well.

9       MR. BARROSO:  One second, Your Honor.

10      Thank you very much for your time.

11      No further questions, Your Honor.

12      MR. MICHELEN:  Your Honor, if I could have 30

13  seconds?

14      (Pause.)

15      Thank you, Your Honor.

16              CROSS-EXAMINATION

17  BY MR. MICHELEN:

18  Q.  Agent, you were at the Luis Muñoz Marin Elementary School

19  that night, right?

20  A.  Correct.

21  Q.  And you were there because you were turning over some

22  traffic citations to your supervisor?

23  A.  Correct.

24  Q.  Agent, I'm going to show you a picture.  Do you recognize

25  that?

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1    A.   Correct.

2    Q.   That's the Luis Muñoz Marin Elementary School?

3    A.   Correct.

4    Q.   It looks -- it's a fair representation of what the school

5    looked like that day, right?

6    A.   Well, you can see the roof, but ...

7    Q.   So, for example, the streets are still there, right?

8    A.   Correct.

9    Q.   Obviously, it was nighttime when you were there, right?

10   A.   Correct.

11   Q.   But in terms of where the physical structures are,

12   everything is the same?

13   A.   Correct.

14        **MR. MICHELEN:**  Your Honor, we move to admit this

15   picture as Defense Exhibit 1.

16        **THE COURT:**  Defendant's Exhibit 1.

17   **BY MR. MICHELEN:**

18   Q.   The Luis Muñoz Marin Elementary School is located inside

19   the Sabana Abajo Public Housing Project, correct?

20   A.   Correct.

21   Q.   You've been there before?

22   A.   Correct.

23   Q.   Many times?

24   A.   Correct.

25   Q.   You mentioned it's a dangerous place?

1  A.  High criminal incidence.

2  Q.  There's a lot of crime there, right?

3  A.  Crimes, like what?

4  Q.  Stabbings?

5  A.  No.

6  Q.  Gun crimes?

7  A.  Correct.

8  Q.  Assaults?

9  A.  Not much.

10  Q.  You mentioned it was a high-crime area, right?

11  A.  High criminal incidence.

12  Q.  Drugs?

13  A.  Correct.

14  Q.  Multiple drug points there, right?

15  A.  No.

16  Q.  One drug point there?

17  A.  That's right.

18  Q.  One drug point.

19     And what is the gang that runs that drug point called?

20  A.  Usually the gangs are identified with the name of the

21  housing project.

22  Q.  And there are a lot of people that are part of that drug

23  trafficking organization, right?

24  A.  Correct.

25  Q.  And they live in there?

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1 **A.** I don't know if they live there.

2 **Q.** People go there to buy drugs?

3 **A.** Many go to buy drugs.

4 **Q.** Heroin?

5 **A.** Correct.

6 **Q.** Crack?

7 **A.** Yes.

8 **MR. BARROSO:** Object to this line of questioning,

9 Your Honor, it's irrelevant.

10 **MR. MICHELEN:** Your Honor, his state of mind, his

11 perception of the location he was at the night of this arrest

12 is crucial to all of his actions that followed.

13 **MR. BARROSO:** How does this relate to his state of

14 mind, Your Honor?

15 **THE COURT:** You don't have to go into detail. I

16 mean, we already know it's a high incidence criminal area, so

17 you don't have to go into details.

18 **MR. MICHELEN:** May we approach, Your Honor?

19 **(At sidebar on the record.)**

20 **MR. MICHELEN:** Your Honor, the jury needs to be able

21 to understand the conditions that the officer was working

22 under, the stress. He mentioned himself that they go there

23 because they want to show a police presence. So I'm just

24 trying to elaborate from the point he made earlier. He said

25 it was high incidence of crime. I'm just trying to detail

1    what kind of crime he's talking about.

2        I don't see what the problem is or what the Government

3    doesn't want us to get into.  He's the one that's opened the

4    door by saying this is a high crime area.  I'm just trying to

5    get information as to what he means by that.

6        **MR. BARROSO:**  We have no fear of the testimony, of

7    the questions that are being asked; however, we would like to

8    focus on the issues, Your Honor, and we believe that this is

9    basically -- this has no relevance to the particular issue

10   that happened that night.  The fact -- the particular

11   incidents of crime that happen in that area are not relevant

12   to what actually happened that night.  The fact that it's a

13   high crime area should be enough for the jury to understand

14   the state of mind of the witness without going into

15   particulars about things like crack, heroin, or whatever in

16   that area.

17       **THE COURT:**  I don't see why you have to elaborate

18   that much.  He already has indicated that his perception was

19   that it's a high-crime area.  And he already testified that it

20   was 9:20, it was late at night, and that's why they seized the

21   gun and didn't wait for the technical unit to come there;

22   unless you want to link that high-crime area to the fact that

23   the gun was there and it was not this defendant that threw the

24   gun.  Is that it?

25       **MS. ROSEN:**  Well, Your Honor, there are multiple

 1  reasons this line of questioning is important.  I don't

 2  believe Mr. Michelen has a lot more, but there's a couple of

 3  points that we can make from this:  One, the point Your Honor

 4  made; two, whether the officer's actions were in line with him

 5  being in a high-crime area; three, I think it's very important

 6  when we're judging the witnesses' credibility whether they can

 7  remember events and things like that, to know the stress they

 8  were operating under at the time, because that has an effect

 9  too.

10          So I think there are three reasons why this line of

11  questioning is pertinent to our defense.

12          **MR. BARROSO:**  But how does that relate to the fact

13  that they sell cocaine or they sell crack or they sell heroin

14  at that drug point; how does that relate to the state of mind

15  at the time, Your Honor?

16          **MR. MICHELEN:**  Your Honor, there's a difference

17  between an arrest that occurs in a well-to-do affluent

18  neighborhood where an officer is not fearing walking around

19  without being shot at, for example, versus when they're making

20  an arrest at a public housing project where he admits there's

21  high crime, where he said that in fact they were there because

22  they want to show presence to the community.

23          So his actions need to be in line with his state of

24  mind.  So that's what I'm trying to elaborate.  I don't have

25  many questions to go on this line.  I would ask two, three more

1   questions.

2        THE COURT:  What more are you going to be asking

3   about that?

4        MR. MICHELEN:  I'm trying to ask him about the types

5   of activities and the types of arrests he's made.

6        THE COURT:  If he's familiar with that.

7        MR. MICHELEN:  If he's familiar with that.

8        MR. BARROSO:  He can ask that directly, not in this

9   roundabout way about the types of activities that happen in

10  the area.  I'm trying to keep it focused on the issue and not

11  confuse the jury, because this is a jury trial.  If it was a

12  bench trial, we wouldn't object.

13       THE COURT:  I will allow you to ask a few more

14  questions, but I don't see exactly, you know --

15       MR. MICHELEN:  I'll ask him.

16       THE COURT:  And I don't know if you're doing a

17  service to your client.

18       (End of sidebar.)

19  BY MR. MICHELEN:

20  Q.  Officer, you mentioned that the reason you and your fellow

21  officers and your sergeant were meeting specifically at the

22  Luis Muñoz Marin Elementary School was because you wanted to

23  show a presence there, right?

24  A.  Well, that was one of the reasons.

25  Q.  So one of the reasons you were there is because you wanted

1  the people that live there to see the police there?

2  **A.**  Correct.

3  **Q.**  You were standing outside of the school, right?

4  **A.**  Correct.

5  **Q.**  And you were there with other officers?

6  **A.**  Correct.

7  **Q.**  About six other officers?

8  **A.**  Approximately.

9  **Q.**  And the sergeants?

10  **A.**  Correct.

11  **Q.**  And you said, you mentioned you saw a vehicle come toward

12  the entrance?

13  **A.**  Correct.

14  **Q.**  And you already mentioned the entrance is that street

15  right there next to the elementary school, right?

16  **A.**  Correct.

17  **Q.**  Can you please mark it with an X?

18  **A.**  Mark what?

19  **Q.**  The street.

20  **A.**  (Witness complies.)

21  **Q.**  Okay, close enough.  So you see the car come in, right?

22  **A.**  Correct.

23  **Q.**  And you see it has very dark tints, that's what you said?

24  **A.**  Correct.

25  **Q.**  And you, at that point, decide that they may be illegal?

1  **A.**  It could entail an offense.

2  **Q.**  The tints were not of the correct -- were not the correct

3  tints legally -- let me rephrase that.

4      The tints were not up to Puerto Rico standards?

5  **A.**  At least I was not able to observe how many persons were

6  inside.

7  **Q.**  And you thought the tints were in violation of the law?

8  **A.**  Correct.

9  **Q.**  So you decide at that point, you mentioned, you're going

10  to pull the car over?

11  **A.**  Correct.

12  **Q.**  So at that point you're going to go get back on your bike,

13  right?

14  **A.**  At the time that the vehicle came out.

15  **Q.**  And you put your helmet on?

16  **A.**  I had it on.

17  **Q.**  You take the kickstand off the bike?

18  **A.**  Correct.

19  **Q.**  You turn on the bike?

20  **A.**  Correct.

21  **Q.**  You have to put it back into the right direction and head

22  out of the public housing project?

23  **A.**  No, it was parked in a position to exit.

24  **Q.**  And you drive it out of the public housing project?

25  **A.**  Correct.

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1  Q.  And at this point you mentioned the car that he was in was

2  already outside of the public housing project?

3  A.  Once I reached the entrance or when I'm getting on it?

4  Q.  When you're getting on it.

5  A.  When I was getting on it, the vehicle was exiting.

6  Q.  And it gets on Monserrate Avenue?

7  A.  Correct.

8        MR. MICHELEN:  Can we print this and save it as an

9  exhibit like this?

10 BY MR. MICHELEN:

11 Q.  So this is, I'm showing you, Officer, Government's Exhibit

12 1.  This is the one you looked at earlier.

13    That's Monserrate Avenue, the long one?

14 A.  Correct.

15 Q.  It's horizontal?

16 A.  Correct.

17 Q.  And that's the avenue the car got on, right?

18 A.  Correct.

19 Q.  There were other cars on the road?

20 A.  Yes.

21 Q.  And you're on a motorcycle, right?

22 A.  Correct.

23 Q.  Going down Monserrate Avenue?

24 A.  Correct.

25 Q.  And quickly, after you start following him out of the

1  housing project, you turn your lights on?

2  **A.**  That's right.

3  **Q.**  You turn your sirens on?

4  **A.**  You don't leave it on, you just sound it off a few times

5  to make it sound, you don't leave it on.

6  **Q.**  But it's loud, right?

7  **A.**  That's correct.

8  **Q.**  It's hard to miss that sound if you're on the street?

9  **A.**  Correct.

10  **Q.**  And you were a few car behind him, right?

11  **A.**  Correct.

12  **Q.**  And the lights are blue lights?

13  **A.**  Blue.

14  **Q.**  So, again, difficult for someone to say they don't see the

15  lights and siren, right?

16       **THE INTERPRETER:**  Counselor, can you repeat?

17  **BY MR. MICHELEN:**

18  **Q.**  I apologize.  So it's difficult for someone to say that

19  they didn't hear or see the lights and sirens?

20  **A.**  Correct.

21  **Q.**  And you're driving down Monserrate Avenue that entire

22  stretch of road?

23  **A.**  Correct.

24  **Q.**  And the whole time the car is ignoring you, correct?

25  **A.**  It did not stop.

1    Q.  So it has possibly illegal tints, right?

2    A.  Correct.

3    Q.  And it's ignoring a police officer?

4    A.  It did not stop.

5    Q.  And you interpreted that as that they were ignoring you?

6    A.  It could be.

7    Q.  I mean, was there -- at any point did you think maybe

8    these people can't hear me?

9    A.  It could be.  I don't know if they have any difficulty

10   hearing, or I don't know.

11   Q.  You were about a car and a half away?

12       MR. BARROSO:  Objection, Your Honor, misleading.

13   That's not what he said.

14       THE COURT:  What?

15       MR. BARROSO:  That's not the distance that was said,

16   Your Honor.  The question is misleading, Your Honor.  It

17   depends on the moment in time when he's referring to, Your

18   Honor.  If he could clarify, maybe I would withdraw the

19   objection.

20       THE COURT:  Yes.

21   BY MR. MICHELEN:

22   Q.  Now I'm talking about specifically about Monserrate

23   Avenue.

24   A.  Correct.

25   Q.  And while you're following the car, you're anywhere

1   between one and a half to three cars, I believe you said?

2   **A.**  No, that's not what I said.

3   **Q.**  Correct me.  Please tell me.

4   **A.**  Between three to four vehicles' distance.

5   **Q.**  And no cars between you guys?

6   **A.**  No.

7   **Q.**  So, again, you're following the car?

8   **A.**  Correct.

9   **Q.**  And the entire time you're going down Monserrate, your

10  lights and sirens are on, right?

11  **A.**  The lights on and the siren sounding it several times.

12  **Q.**  You did it more than three times, you sounded the siren?

13  **A.**  Correct.

14  **Q.**  More than five times?

15  **A.**  I don't recall that.

16  **Q.**  Then you get to El Comandante Avenue, right?

17  **A.**  Correct.

18  **Q.**  That's the perpendicular avenue that you mentioned

19  earlier, right?

20  **A.**  Correct, on the photograph, to the far right.

21          **THE INTERPRETER:**  Correction, to the far left.

22  Correction.

23  **BY MR. MICHELEN:**

24  **Q.**  I'm going to show you, Officer, this is the same picture

25  but now with your markings on it, right?

EDUARDO HERNÁNDEZ – (CROSS BY MR. MICHELEN)

1   **A.** Correct.

2   **Q.** So this is Comandante Avenue?

3   **A.** Correct.

4   **Q.** So the car turns, right?  Yes?

5   **A.** Yes.

6   **Q.** And you mentioned -- did you lose the car at any moment?

7   **A.** Maybe for a few seconds when it turned.

8   **Q.** And then once you turned the corner, you saw the car

9   again?

10  **A.** Correct.

11  **Q.** And your lights are still on?

12  **A.** That's right.

13  **Q.** Blue lights?

14  **A.** Blue lights.

15  **Q.** At that point you said the passenger opens the door,

16  right?

17  **A.** Correct.

18  **Q.** And throws a gun?

19  **A.** That's right.

20  **Q.** Onto the grass?

21  **A.** Correct.

22  **Q.** In front of a house?

23  **A.** Correct.

24  **Q.** Specifically, house number two?

25  **A.** Correct.

1  **Q.**  And you were right behind the car at this point?

2  **A.**  Correct.

3  **Q.**  In fact, the car had slowed down, you said?

4  **A.**  Correct.

5  **Q.**  So that made it even easier for you to see it?

6  **A.**  Correct.

7  **Q.**  So now, and because you had your lights on, you could see

8  what was thrown?

9  **A.**  My lights were on and the electric power light poles were

10  on.

11  **Q.**  And to you, it was clearly a gun that was thrown from the

12  car?

13  **A.**  Correct.

14  **Q.**  And to you, clearly the passenger actually stuck his body

15  out; is that what you said?

16  **A.**  Not his whole body.

17  **Q.**  But enough that you could see the color of his shirt?

18  **A.**  Correct.

19  **Q.**  The back of his head?

20  **A.**  Correct.

21  **Q.**  And you saw his body come out of the car?

22  **A.**  Correct.

23  **Q.**  And toss a gun?

24  **A.**  That's right.

25  **Q.**  So you said there were light posts and you saw the gun

1  come out, right?

2  **A.**  Correct.

3  **Q.**  So now you're in a situation where you're the only officer

4  at this point behind the car, right?

5  **A.**  I wasn't the only one.

6  **Q.**  You mentioned that Officer Marrero showed up once the car

7  was stopped?

8  **A.**  Correct.

9  **Q.**  So at this point it's just you?

10  **A.**  Correct, at that point, at that specific point, yes.

11  **Q.**  So now, again, at that point you're the only officer

12  there, right?

13  **A.**  Correct.

14  **Q.**  At that point the first thing you witnessed was a car with

15  possibly illegal tints, right?

16  **A.**  Correct.

17  **Q.**  Then the car makes what's possibly an illegal U-turn?

18  **A.**  Not illegal, not necessarily illegal.

19  **Q.**  Possibly?

20  **A.**  Not to me.

21  **Q.**  Then you have, according to you, an illegal -- possibly

22  illegal tints?

23  **A.**  Correct.

24  **Q.**  And a car that is possibly ignoring you?

25  **A.**  Well, it depends on the perspective, it could be or it

 1   could not.

 2   **Q.** So I want to just make sure the jury understands. You're

 3   saying that it was possible, you at that point thought it may

 4   be reasonable that this person can't hear me; that's what you

 5   want them to believe?

 6        **MR. BARROSO:** Objection, Your Honor, that's

 7   argumentative.

 8        **THE COURT:** That calls for an opinion.

 9        **MR. MICHELEN:** Your Honor, I'm asking for what his

10   opinion was that night.

11        **THE COURT:** No, no, I'm not going to allow it. You

12   can ask him what his perception was at that time.

13   **BY MR. MICHELEN:**

14   **Q.** Is your testimony today that you thought that the people

15   in the car possibly were deaf?

16   **A.** It's that I cannot pinpoint -- I cannot say whether or not

17   they were deaf. I know that the vehicle did not stop.

18   **Q.** I understand you can't say that. My question isn't

19   whether the people in the car were actually deaf or not.

20        My question is did you think the people in the car were

21   deaf?

22        **MR. BARROSO:** Objection, Your Honor, asked and

23   answered.

24        **THE COURT:** Asked and answered.

25        **MR. MICHELEN:** Your Honor, I don't believe he's

 1  answered that question, but I'll move on.

 2  **BY MR. MICHELEN:**

 3  **Q.**  So, again, possibly illegal tints; people possibly

 4  ignoring you?

 5  **A.**  Correct.

 6  **Q.**  And not only that, but they're ignoring you all of

 7  Monserrate Avenue, right?

 8       **MR. BARROSO:**  Objection, Your Honor, at no point has

 9  the witness stated that they were ignoring him, Your Honor,

10  that is a statement made by the defense.

11       **THE COURT:**  He just says that the car didn't stop, it

12  went on.

13  **BY MR. MICHELEN:**

14  **Q.**  The car did not stop all of Monserrate Avenue, correct?

15  **A.**  Correct.

16  **Q.**  And you mentioned throughout the entire Monserrate Avenue,

17  you were behind the car, there was no other car between you

18  guys?

19  **A.**  Correct.

20  **Q.**  Then when they get to Comandante Avenue, they make a

21  right?

22  **A.**  Correct.

23  **Q.**  They still don't stop the car?

24  **A.**  No.

25  **Q.**  Then when you make the right, you see them -- you see

1  somebody from the passenger side open the door, right?

2  **A.**  Correct.

3  **Q.**  Stick part of his body out of the car?

4  **A.**  Correct.

5  **Q.**  And throw a gun?

6  **A.**  That's right.

7  **Q.**  Right in front of you?

8  **A.**  Correct.

9  **Q.**  And you're alone at this point?

10  **A.**  At that time, yes.

11  **Q.**  So you keep following the car?

12  **A.**  Correct.

13  **Q.**  And it stops.

14  **A.**  Further on.

15  **Q.**  A few houses down, right?

16  **A.**  Correct.

17  **Q.**  Now the car is stopped?

18  **A.**  That's right.

19  **Q.**  And like you mentioned, you don't even know how many

20  people there are in there?

21  **A.**  Correct.

22  **Q.**  You don't know if there's more guns in there?

23  **A.**  No.

24  **Q.**  It was a car that you said you saw tried to go into Sabana

25  Abajo Public Housing Project?

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1  A.  Correct.

2  Q.  And then when he saw the police, they turned around?

3  A.  Correct.

4  Q.  You don't know if there are other -- if there are drugs in

5  the car, right?

6  A.  No.

7  Q.  Other guns?

8  A.  No.

9  Q.  You don't know if there's two people or five people?

10  A.  No.

11  Q.  You don't know if there are four other people in that car

12  and each of them have a gun?

13  A.  At the moment the vehicle was stopped, no.

14  Q.  So now you see the car all of a sudden stop?

15  A.  Correct.

16  Q.  And then you get off your bike?

17  A.  Correct.

18  Q.  And you had already told Sergeant Marcano, hey, this guy

19  threw a gun, right, over the radio?

20  A.  Correct.

21  Q.  So after all of this has happened, right, you get off of

22  your bike?

23  A.  Correct.

24  Q.  I'm showing you Government's Exhibit 2, Officer.  You get

25  off of your bike, you walk up to the driver's side?

1   **A.**   Correct.

2   **Q.**   Told him to lower his window?

3   **A.**   They were already down.

4   **Q.**   And you tell the driver, "Excuse me, your license and

5   registration, please"?

6   **A.**   Not exactly in the way you are projecting it.

7   **Q.**   Feel free to explain.

8   **A.**   Already at that time, by observing that the individual had

9   thrown out the firearm, we approached with the proper

10  precautions, and we did not reach specifically the front of

11  the door.  But the moment when I did reach the area of the

12  driver, since the window was down, I was able to observe that

13  there were only two persons.

14      In addition to that, I was able to observe their hands,

15  none of them had anything in their hands, none of them

16  represented any danger to me nor to my co-workers.

17  **Q.**   So you're saying you felt they were not a danger?

18  **A.**   Well, at that time, since the hands do not have anything;

19  I mean, what danger can I feel when I see that their hands are

20  empty?

21  **Q.**   You didn't come with your gun out, right?

22  **A.**   We always come out with our hand on our weapon, I mean, we

23  can't go and point it at them, but we always have our hands

24  like this, in this position, so that in the event we can hold

25  onto the weapon.

1  **Q.** When you approached the car, you did not have your gun

2  drawn at the car, right?

3  **A.** No.

4  **Q.** You did not order the occupants, "Get out of the car right

5  now"; you didn't do that, right?

6  **A.** No, I didn't do that.

7  **Q.** Instead, like you said earlier, you asked the driver for

8  his license and his registration?

9  **A.** Quickly, initially that's the first thing I said.

10 **Q.** That is the first thing you told him?

11 **A.** Correct.

12 **Q.** You mentioned -- I want to talk to you about the window

13 tints for a second.

14 **A.** Okay.

15 **Q.** You're certified to work the photometer, right?

16 **A.** Correct.

17 **Q.** You mentioned you had an entire day course?

18 **A.** Correct.

19 **Q.** And they taught you how to use the machine?

20 **A.** That's right.

21 **Q.** They taught you how to know if the car indeed did have

22 illegal tints or not?

23 **A.** Correct.

24 **Q.** And you've been doing this for years?

25 **A.** That's right.

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1  Q.  To the point where even without necessarily testing the

2  window, you can say those are probably illegal or not?

3  A.  What the law specifies is that once the windows are dark,

4  we have to use a photometer to specifically know whether or

5  not they're in violation.

6  Q.  Right, because you may be wrong?

7  A.  Correct.

8  Q.  So that's why it's important to do the test?

9  A.  Correct.

10  Q.  Now, in this case, you didn't do any fingerprints?

11  A.  Of what?

12  Q.  For the gun, for example.

13  A.  No.

14  Q.  And you didn't test for DNA?

15  A.  No.

16  Q.  But you said the reason you didn't do that is because you

17  saw it?

18  A.  Saw who?

19  Q.  You saw the passenger throw the gun?

20  A.  Correct.

21  Q.  So even though a fingerprint test would confirm

22  something --

23  A.  Confirm what?

24  Q.  Whether the fingerprints are on it or not.

25  A.  Correct.

1  **Q.** Even though it could confirm it, you chose not to do it?

2  **A.** I did not find it necessary.

3  **Q.** But you did find it necessary to test the window with the

4  photometer?

5  **A.** Correct.

6  **Q.** That was a test you did want to do?

7  **A.** That I had to do.

8  **Q.** You had to do that one?

9  **A.** Correct.

10 **Q.** Let's talk about the cell phone, Officer.

11     You mentioned you also found a cell phone?

12 **A.** Correct.

13 **Q.** And you even drew -- you mentioned it was a black phone,

14 right?

15 **A.** Correct.

16 **Q.** What color is that?

17 **A.** Well, it looks white there.

18 **Q.** Are you saying it's possible that it's not white?

19 **A.** No, there it is.

20 **Q.** Would you like to look at it?  (Handing)

21     Is it white?

22 **A.** In the back, it's white, obviously it's completely white

23 in the back.  But in the front it has the screen that's black.

24 **Q.** Okay, that's true.  Let me just -- I want to make sure the

25 jury is clear of what you're saying.  You're telling the jury

 1  that the reason you said it was black is because the screen is

 2  black?

 3  **A.**  At that time, observing the cell phone, I saw that it was

 4  black because it was placed with the screen upward.

 5  **Q.**  So the answer to my question is?

 6  **A.**  Since the screen was facing upward and that's what I

 7  observed there, I observed that it was black.

 8  **Q.**  Have you ever seen a phone that doesn't have a black

 9  screen?

10  **A.**  Well, possibly, if it's on.

11  **Q.**  Officer, you also did an inventory log in this case,

12  right?

13  **A.**  Correct.

14  **Q.**  This is an official form?

15  **A.**  Correct.

16  **Q.**  That you do in every case?

17  **A.**  Correct.

18  **Q.**  And you did one in this case?

19  **A.**  That's right.

20  **Q.**  And the point of it is to document everything you found?

21  **A.**  In addition to the evidence.

22  **Q.**  Okay.  And you document everything you found?

23  **A.**  Correct.

24  **Q.**  And you did one in this case?

25  **A.**  That's right.

1  Q.  And in this case, you wrote that it was white?

2  A.  Correct.

3  Q.  Right?

4  A.  Correct.

5  Q.  But today you told the jury it was black?

6  A.  Today I told the jury that when I observed it, the cell

7  phone looked black.  You didn't ask me about now; about when I

8  did the inventory.

9  Q.  It's not about what I asked you, it's when the Government

10  asked you.

11  A.  Correct.

12  Q.  You also did a vehicle inventory in this case, right?

13  A.  Correct.

14  Q.  And you do that in every case?

15  A.  Cases where vehicles are seized.

16  Q.  And the point of doing that is because you want to make

17  sure that you know everything that's in the car, for example?

18  A.  Correct.

19  Q.  You want to make sure that you know if the car is damaged,

20  for example?

21  A.  Correct.

22  Q.  You do that for a few reasons, right?

23  A.  Correct.

24  Q.  For example, one reason is in case there's another

25  evidence of more crimes in the car, right?

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1  **A.**  The main reason is to safeguard the state in which the

2  vehicle comes in, so that after this, if the vehicle is

3  returned or if anything happens with the vehicle, they can't

4  maybe say that the vehicle is in another state than when we

5  had seized it.

6  **Q.**  Exactly.

7  **A.**  Correct.

8  **Q.**  Because you don't want someone to sue the police

9  department saying "you broke my car"?

10  **MS. ROSEN:**  Your Honor, the headphone is not working,

11  can we have a moment to make sure Mr. Domenech can understand

12  everything?

13  (Pause.)

14  **MS. ROSEN:**  Thank you.  Sorry for the interruption.

15  **BY MR. MICHELEN:**

16  **Q.**  Because you don't want people -- you want to make sure you

17  can prevent someone from saying "Officer Hernández Quiñones

18  broke my car"?

19  **A.**  Correct.

20  **Q.**  So it's an actual checklist, right?

21  **A.**  That's right.

22  **Q.**  Where you check every part of the car?

23  **A.**  The part that the checklist says.

24  **Q.**  And in this case there was no indication that the windows

25  were not working, right?

EDUARDO HERNÁNDEZ – (CROSS BY MR. MICHELEN)

1  A.  No.

2  Q.  You took this picture, Officer?

3      I'm showing you what's been marked as Government's

4  Exhibit 3.  You took this picture?

5  A.  Correct.

6  Q.  And I don't believe we have the exhibit that shows the

7  marking you did.

8          THE CLERK:  We have it.

9          MR. MICHELEN:  We have it?

10          THE CLERK:  I gave you all of them.

11  BY MR. MICHELEN:

12  Q.  Officer, just tell us one more time, where did you find

13  the cell phone?

14  A.  Around this area.

15          MR. MICHELEN:  I guess -- unless the other one

16  exists, so we can introduce this as an exhibit?

17          THE CLERK:  What?

18          MR. MICHELEN:  Unless the other one exists, can we

19  introduce this as an exhibit?

20          THE CLERK:  It exists, 3A.

21          MR. MICHELEN:  I can't find it.  In an abundance of

22  caution, if we can just do it again.  I can't find 3A.

23          THE CLERK:  I gave all of them to you.

24          MR. BARROSO:  To be clear, I didn't request for the

25  marked picture to be marked as Exhibit 3A when I removed it.

1   I went from 3 to 4, so maybe that's why it's not...

2          **THE CLERK:**  But I printed it.  But I don't have it

3   here, let me double check.

4   **BY MR. MICHELEN:**

5   **Q.**  In the meantime, Officer, but you didn't take a picture of

6   the cell phone?

7   **A.**  No.

8   **Q.**  And you said earlier that it was illuminated, right?

9   **A.**  Correct.

10  **Q.**  This part of the street?

11  **A.**  Well, at least the whole road, yes.

12  **Q.**  The light that's shining on the gun is from one of your

13  motorcycles?

14  **A.**  Correct.

15  **Q.**  The light doesn't just shine right on the gun, right?

16  **A.**  The outside lights, no.  What's lighting there is the

17  motorcycle.

18  **Q.**  So let's go back now to after you approached the car and

19  asked for the license and registration.

20  **A.**  Correct.

21  **Q.**  Soon after that, you arrest both the driver and the

22  passenger?

23  **A.**  I arrested the driver.

24  **Q.**  You arrested the driver, and he was taken to jail that

25  night?

1  **A.**  That night, yes, he stayed in the station, one of the
2  cells of the station.
3  **Q.**  And he was arrested for possession of a gun?
4  **A.**  For having thrown out the firearm which it was understood
5  was in his possession.
6  **Q.**  The driver?
7  **A.**  The driver, in the cases of the Puerto Rico Police, are
8  always arrested for possession and mutual consent.
9  **Q.**  So the driver was arrested?
10 **A.**  Correct.
11 **Q.**  For possession of a gun?
12 **A.**  Consent and mutual agreement.  Usually that is why most
13 all the passengers are arrested in the vehicle.
14 **Q.**  Consent and mutual agreement to what?
15 **A.**  Possessing a firearm illegally in a vehicle, or that they
16 do not have a license to possess a firearm.
17 **Q.**  So, again, I'm not trying to make this complicated.  The
18 driver was arrested for possession of a gun?
19        **MR. BARROSO:**  Asked and answered, Your Honor, third
20 time.
21        **THE COURT:**  It's asked and answered.
22 **BY MR. MICHELEN:**
23 **Q.**  You saw the passenger throw a gun, right, that's what you
24 said?
25 **A.**  Correct.

1  Q.  And you arrest the driver?

2  A.  Initially, the driver, I first arrested the driver, and my

3  fellow officer arrested the passenger.

4  Q.  But at no point in that night did you say to your sergeant

5  or anyone else, "Hey, guys, wait, hold on, the driver didn't

6  do anything"?

7  A.  No.

8  Q.  Even though you say you saw the passenger throw the gun?

9  A.  Correct, because if the passenger threw the firearm, which

10  is what I saw, from inside the vehicle, the driver is supposed

11  to be the one in charge of whatever happens inside the

12  vehicle.  If anyone has an illegal weapon, they're supposed to

13  know everything that's inside the vehicle and they're supposed

14  to have seen the individual throw out the weapon.

15      That's why consent and mutual agreement comes in.

16  Q.  So then you did think the driver was guilty of the

17  possession of the gun?

18  A.  That he had given his consent to the person who had it, to

19  get in his vehicle, even knowing that that person did not have

20  any license.

21  Q.  So you did think he committed a crime?

22  A.  Correct, both.

23  Q.  And then later that night, you called ATF?

24  A.  Correct.

25  Q.  And the U.S. Attorney's Office?

1 **A.** I did not call the U.S. Attorney's Office.  I called them,

2 and they contacted them.

3 **Q.** And they told you -- let me back up, sorry.

4    At that point you already knew that Josean was a convicted

5 felon?

6 **A.** Well, at that point, I don't recall -- I don't recall

7 having known him, I believe not.

8 **Q.** No, I don't think you know every convicted felon.

9    My question is, you already ran records by the time you

10 were at the police station?

11 **A.** At least at the police, we do not have at the police

12 station any means to run background checks.

13 **Q.** So you informed ATF that you had this case for them?

14 **A.** That I had a case that since the serial number was

15 obliterated, they probably had jurisdiction.

16 **Q.** So then the driver and Josean spent the night in jail?

17 **A.** I believe so.

18 **Q.** Then the next morning, the driver is let go?

19 **A.** Correct.

20 **Q.** Because they told you to let him go?

21         **MR. BARROSO:**  Objection, calls for hearsay.

22         **MR. MICHELEN:**  It's not hearsay, it's effect on the

23 listeners, Judge, it's to show the actions he made.

24         **THE COURT:**  Because "they told you."

25

1  **BY MR. MICHELEN:**

2  **Q.** Who told you?

3  **A.** What?

4  **Q.** To let the driver go.

5          **MR. BARROSO:** Objection, Your Honor, calls for

6  hearsay. It doesn't matter who told him; somebody told him.

7          **THE COURT:** No. Go ahead and answer.

8          **THE WITNESS:** At least the driver, once you don't

9  have federal jurisdiction, the state prosecution is supposed

10 to tell us what to do in the case of the driver.

11 **BY MR. MICHELEN:**

12 **Q.** That's not answering the question.

13     The question is who told you to let the driver go?

14 **A.** At this time, I don't have my notes or anything, I cannot

15 refresh my recollection as to who told me.

16 **Q.** Did you bring your notes, Officer?

17 **A.** No.

18 **Q.** You didn't bring your notes to testify in trial?

19 **A.** No.

20         **MR. BARROSO:** Just to be clear, Your Honor, the notes

21 were produced in the JENCKS package that was sent to the

22 defense.

23 **BY MR. MICHELEN:**

24 **Q.** Officer, you wrote what's called an *Informe de Incidente*

25 in this case, right?

 1   **A.**   Correct.

 2   **Q.**   And what that is, it's an official report?

 3   **A.**   Correct.

 4   **Q.**   It's a report that you generate in each case where you

 5   arrest somebody?

 6   **A.**   Correct.

 7   **Q.**   And the purpose of the report is to document what happened

 8   in the case?

 9   **A.**   The basic details.

10   **Q.**   And it's a report that will follow the person arrested

11   throughout the rest of the case?

12   **A.**   Well, remember that I'm talking to you about at the state

13   level, which is what I know.  At least at the state level, if

14   the attorney asks for the copies, they are tendered to him.

15   **Q.**   So I asked you a few minutes ago if you remembered who

16   told you to let the driver go.

17   **A.**   Correct, and I answered that I did not recall.

18   **Q.**   Would looking at your report refresh your memory about

19   what happened?

20   **A.**   Correct.

21          **MR. MICHELEN:**  May I approach, Your Honor?

22   **BY MR. MICHELEN:**

23   **Q.**   Do me a favor, Officer, look at your report that you wrote

24   and let the jury know if now you remember who told you to let

25   the driver go.

1 **A.** Will you allow me to read it a minute?

2      **MR. MICHELEN:** Of course.

3      (Pause.)

4 **BY MR. MICHELEN:**

5 **Q.** Do you remember now?

6 **A.** Correct.

7 **Q.** So who told you to let the driver go?

8 **A.** By instructions of the federal agent who, in turn, had

9 consulted with the federal prosecutor.

10 **Q.** And what are their names?

11 **A.** Well, at least the agent who was with me in this case was

12 Agent Paduil Torres and federal prosecutor Omar Barroso.

13 **Q.** Do you see them in the courtroom today?

14 **A.** Well, at least Agent Paduil, yes.

15 **Q.** Can you point him out, please?

16 **A.** Correct.

17 **Q.** The third person sitting there?

18 **A.** Well, from my point of view from left to right, the first

19 one.

20 **Q.** And the prosecutor, you don't see him in court today?

21 **A.** I don't know him.

22      **THE COURT:** I'm going to take a little break now

23 because the defendant has to go to the bathroom.

24      **MR. MICHELEN:** I don't think I have many questions

25 left, we can take a break.

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1    **THE COURT:**  You have one more, two?

2    **MR. MICHELEN:**  I do have a few more, if Your Honor

3  wants, we can take a break.

4    **THE COURT:**  Ten minutes, and we'll be back.

5    (Jury out at 4:53 p.m.)

6    **THE COURT:**  Tell the witness that we're taking a

7  ten-minute recess and he's not to talk to anyone concerning

8  this case.

9    **THE WITNESS:**  May I go to the restroom?

10    **THE COURT:**  Yes, he can.

11    (Whereupon the Court took a recess, after which the

12  trial continued as follows.)

13    **THE COURT:**  We will proceed in cross-examination.

14    **MR. MICHELEN:**  Thank you, Your Honor.

15  **BY MR. MICHELEN:**

16  **Q.**  Officer, a few more questions.

17    Earlier you said that not only did someone throw a gun

18  from the car, but someone threw a phone from the car?

19  **A.**  Well, I didn't specifically say that he had thrown a cell

20  phone.  What I said was that a phone was also seized.

21  **Q.**  Near the gun?

22  **A.**  Correct.

23  **Q.**  And if he didn't throw it, Officer, how else could it have

24  gotten to the ground?

25    **MR. BARROSO:**  Objection, calls for speculation.

1    **MR. MICHELEN:**  I'll rephrase.

2    **THE COURT:**  He's going to be speculating.

3  BY MR. MICHELEN:

4  **Q.**  Officer, you said you found the phone near the gun?

5  **A.**  Correct.

6  **Q.**  You said right around here, right?

7  **A.**  Correct.

8  **Q.**  In your *Informe de Incidente* that you wrote, you didn't

9  write that in there, right?

10  **A.**  It's not necessary.

11  **Q.**  That's not important?

12  **A.**  It's not that it's not important; it's not necessary for

13  that document.

14  **Q.**  So it is important?

15  **A.**  No, it was something that was seized.

16  **Q.**  And you wrote it in the inventory log I showed you

17  earlier, right?

18  **A.**  On the document, correct, on the document where the cell

19  phone thing was written.

20  **Q.**  This document, right?

21  **A.**  Correct.

22  **Q.**  And this inventory log, what it says is:  Person from

23  where it was occupied, right?

24  **A.**  Correct, to whom it belongs.

25  **Q.**  Here you didn't write "found on the ground"?

EDUARDO HERNÁNDEZ - (CROSS BY MR. MICHELEN)

1  A.   It's not necessary.

2  Q.   It's not necessary.

3       You also took this picture, right?

4  A.   Correct.

5  Q.   And you said the phone was right there?

6  A.   More or less around this area.

7  Q.   And you didn't walk a little further and take a picture of

8  the phone too?

9  A.   No.

10 Q.   You also said that when AUSA Barroso was asking you

11 questions, you said that Josean told you, "I threw a beer"?

12 A.   Correct.

13 Q.   You didn't write that in here?

14 A.   No.

15 Q.   That's not important?

16 A.   It's not necessary.  Important and necessary are two

17 different things.

18 Q.   So are you saying it's important but it's not necessary?

19 A.   Correct, it is not necessary for that document.

20       **MR. MICHELEN:**  Your Honor, if I can have ten seconds.

21 **BY MR. MICHELEN:**

22 Q.   Officer, I'm going to show you again this inventory log.

23       If you were to seize a phone, to find a phone on someone's

24 body, on someone's pants or shirt or person, you would

25 write -- you would do a form just like this, right?

1          **MR. BARROSO:**  Your Honor, we haven't objected before,

2    but the fact of the matter is that this document is in

3    Spanish.  If they're going to introduce it as evidence or use

4    it to impeach the witness, Your Honor, it has to be

5    translated.  This one is not.  So I purport that it shouldn't

6    be used, it shouldn't be shown at all.

7          **MR. MICHELEN:**  Your Honor, I haven't attempted to

8    introduce it into evidence and I'm not using it as

9    impeachment.

10         **MR. BARROSO:**  It's being shown to the witness, to the

11   jury, Your Honor.

12         **MR. MICHELEN:**  I'm not impeaching anybody.  I'm

13   asking him a question.

14         **THE COURT:**  But why are you showing it then?

15         **MR. MICHELEN:**  I can show it to him personally.

16         **THE COURT:**  Yes, okay.

17         **MR. MICHELEN:**  May I approach, Your Honor?

18   **BY MR. MICHELEN:**

19   **Q.**  Officer, this form is the inventory log, right?

20   **A.**  Correct.

21   **Q.**  If you were to find a phone on someone when you arrest

22   them, you would fill out a form just like that, right?

23   **A.**  Correct.

24   **Q.**  One of the last things you did, Officer, in this case, was

25   interview with ATF Task Force Officer Paduil Torres, right?

1    **A.**  Correct.

2    **Q.**  And he interviewed you in person?

3    **A.**  Correct.

4    **Q.**  And the reason for the interview was because he was going

5    to take over the case now?

6    **A.**  Because he was going to see whether there were elements

7    for the ATF to have jurisdiction.

8    **Q.**  And for him to know that, you had to tell him everything

9    that happened?

10   **A.**  What happened, correct.

11   **Q.**  And you told him everything?

12   **A.**  Maybe I may have left out some detail, but I understand I

13   told him everything.

14   **Q.**  All the important things for sure?

15   **A.**  I understand so.

16            **MR. MICHELEN:**  Thank you, Officer.

17            No further questions, Judge.

18            **THE COURT:**  Do you have any redirect?

19            **MR. BARROSO:**  Very briefly, Your Honor.

20                        REDIRECT EXAMINATION

21   **BY MR. BARROSO:**

22   **Q.**  Agent, during cross-examination you indicated to the

23   defense that the reason you initially called ATF was because

24   the gun had a mutilated serial number?

25   **A.**  Correct.

EDUARDO HERNÁNDEZ – (REDIRECT)

1   **Q.** If I were to show you a picture of the gun, would you be

2   able to identify it?

3   **A.** Correct.

4       **MR. BARROSO:** Please mark it as ID No. 6 for the

5   Government.

6   **BY MR. BARROSO:**

7   **Q.** Agent, do you recognize what is on the screen?

8   **A.** Correct.

9   **Q.** What is it?

10  **A.** The weapon that I seized that night and which is in front

11  of me.

12  **Q.** I'm going to zoom in a little bit.

13      What is that right there?

14  **A.** That's where the serial number is supposed to be, in that

15  space, which serial number is completely damaged, obliterated,

16  you can't see what the serial number is.

17  **Q.** Agent, I ask you, could that type of damage have come from

18  wear and tear, normal wear and tear of use of the weapon?

19      **MR. MICHELEN:** Objection, calls for speculation, lack

20  of foundation, calls for -- lack of foundation.

21      **MR. BARROSO:** Your Honor, I'm asking him his

22  experience as a long time police officer, Your Honor.  He

23  should be able to make an informed opinion as to where that

24  damage could possibly come from.

25      **THE COURT:** You're asking him based on his experience

1   as a police officer?

2           MR. BARROSO:  Yes, Your Honor.

3           THE COURT:  And how many guns has he occupied, you

4   know, during that time?

5           MR. BARROSO:  I could ask, Your Honor.

6   BY MR. BARROSO:

7   Q.  In your time as a police officer, how many weapons have

8   you seized during interventions such as the one we're here for

9   today?

10  A.  Many and of different types and sizes.

11  Q.  Have you ever seen a gun like this one before?

12          MR. MICHELEN:  Your Honor, at this point I object,

13  this is beyond the scope of cross-examination.  We never even

14  touched on the subject.

15          MR. BARROSO:  Well, Your Honor, they opened the door

16  when they spoke about specifically the mutilation of the

17  firearm, Your Honor.  We are just qualifying him as a witness

18  to make an opinion regarding this mutilation specifically.

19          THE COURT:  Okay.  Go ahead.

20          MR. MICHELEN:  Your Honor --

21          THE COURT:  It's overruled.

22          MR. MICHELEN:  -- he's not an expert.

23          THE COURT:  It's overruled.

24  BY MR. BARROSO:

25  Q.  Please answer.  This particular -- weapons of this

EDUARDO HERNÁNDEZ – (REDIRECT)

1    particular type, where have you seen them before?

2    **A.**   Correct, I have seen them and I've had them.

3    **Q.**   When you say you've had them, what do you mean by that?

4    **A.**   The first gun that the Puerto Rico Police assigned to me,

5    gave to me, was this kind of weapon.

6    **Q.**   Do you remember how long you had that gun?

7    **A.**   Around five years.

8    **Q.**   In those five years, did the serial number wear and tear

9    enough to look something like that?

10   **A.**   Never.

11   **Q.**   *Nunca*?  I'm sorry, never?

12   **A.**   Never.

13           **MR. BARROSO:**  No further questions, Your Honor.

14           **MR. MICHELEN:**  Your Honor, may I ask a quick

15   question?

16           **THE COURT:**  Yes.

17                      RECROSS-EXAMINATION

18   **BY MR. MICHELEN:**

19   **Q.**   Officer, you said that this type of gun is the gun that

20   was given to you, given to the officers when you guys joined

21   the department?

22   **A.**   At least when I graduated, this was the one that was given

23   to me.

24   **Q.**   And to all the other cadets?

25   **A.**   In my academy, yes.

 1  **Q.**  A gun just like this one?

 2  **A.**  Correct.

 3          **MR. MICHELEN:**  No further questions.

 4          **THE COURT:**  Very well.

 5          It's 5:21, so I'm going to recess for the day today

 6  and we will resume tomorrow at 10:00 a.m.

 7          I don't know if we may have to go through the whole

 8  day tomorrow.

 9          **MR. BARROSO:**  We have at least two more witnesses,

10  Your Honor.

11          **THE COURT:**  Two more witnesses, okay.  That doesn't

12  mean you'll be off the hook, because I have to instruct you

13  and whatnot, but we'll be here by 10 tomorrow.

14          And then remember my instructions to you, you know,

15  you are not to arrive at any conclusions whatsoever.  The

16  evidence is just coming in, and you're not to discuss this case

17  either among yourselves or with any third parties.  If anybody

18  should approach you concerning this case, you have to notify

19  the court security officer.  And anything that may happen out

20  there has nothing to do, you know, only the evidence properly

21  presented here is what you'll be taking into account when I

22  properly instruct you at the end of the case.

23          And remember, as I have said initially, the defendant

24  is presumed innocent and the Government has the burden of proof

25  all throughout to prove him guilty beyond reasonable doubt.

1          So with that said, tomorrow we'll see you at 10.

2          (Jury out at 5:23 p.m.)

3          **THE COURT:**  You have two more witnesses.  Very well.

4   Because what I'm planning to do is, we'll go through it

5   tomorrow, see how far we go, and if we finish the testimony

6   tomorrow, we're not going to be working on Wednesday because

7   Wednesday is going to be a very heavy day here, we have

8   certain arguments concerning the oversight board, and then I

9   have a very important judges' meeting, you know, that I have

10  to go to, and then we would resume on Thursday.

11         **MR. BARROSO:**  Fine, Your Honor.

12         **THE COURT:**  Very well.  I guess that's it.

13         **MR. MICHELEN:**  Thank you, Your Honor.

14         Your Honor, if we do finish the testimony tomorrow,

15  would there be a chance to go into closings, instruct the jury?

16  I don't anticipate our witnesses are going to take too long.

17         **THE COURT:**  I don't know, it depends upon whether

18  you're going to be presenting --

19         **MR. MICHELEN:**  I agree that those witnesses should

20  not take very long.

21         **THE COURT:**  We'll have to see how it goes.  Very

22  well.

23         (Whereupon at 5:25 p.m. the Court adjourned until

24  Tuesday, July 24, 2018.)

25

REPORTER'S CERTIFICATE

        I, ZULMA M. RUIZ, Official Court Reporter for the United States District Court for the District of Puerto Rico, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct computer-aided transcript of proceedings had in the within-entitled and numbered cause on the date herein set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

                              S/Zulma M. Ruiz
                    _____

                         Official Court Reporter