1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF PUERTO RICO
2

3    UNITED STATES OF AMERICA,        )
                                      )
4                    Plaintiff,       )   Case No. 17-498
                                      )
5            vs.                      )
                                      )
6    JOSEAN DOMENECH-ROBLES,          )
                                      )
7                    Defendant.       )

8

9              EXCERPT OF FURTHER JURY TRIAL

10        BEFORE THE HONORABLE JAY A. GARCIA-GREGORY

11          TUESDAY, JULY 24, 2018, 10:19 A.M.

12                HATO REY, PUERTO RICO

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:       OMAR BARROSO
                              TIMOTHY HENWOOD
16                            **ASSISTANT U.S. ATTORNEYS**

17

18   FOR THE DEFENDANT:       JUAN MICHELEN
                              LAUREN ROSEN
19                            **ASSIST. FEDERAL PUBLIC DEFENDERS**

20

21   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
22   _____
                    ZULMA M. RUIZ, RMR
23              Federal Official Court Reporter
                    150 Carlos Chardón
24                 Hato Rey, PR  00918

25

1              P R O C E E D I N G S

2          **THE COURT:**  So we will resume the case.

3          Your next witness, Government witness.

4          **MR. BARROSO:**  Yes, Your Honor.  The Government would

5    like to call to the stand Sergeant Ramon Marcano Miranda, he's

6    right outside, Your Honor.

7          **THE CLERK:**  Raise your right hand, please.

8        **RAMON MARCANO MIRANDA, GOVERNMENT WITNESS, SWORN IN**

9          **MR. BARROSO:**  Permission to question the witness.

10                      DIRECT EXAMINATION

11   **BY MR. BARROSO:**

12   **Q.**  Good morning, sir.

13   **A.**  Good morning.

14   **Q.**  Please state your name for the record.

15   **A.**  Ramon Marcano Miranda.

16   **Q.**  Ramon, what do you do for a living?

17   **A.**  I work for the Puerto Rico Police.

18   **Q.**  How long have you worked for the police?

19   **A.**  Twenty-two years.

20   **Q.**  What division are you currently assigned to?

21   **A.**  The Motorized Unit of Carolina.

22   **Q.**  How long have you been working for that unit?

23   **A.**  Approximately four years.

24   **Q.**  What other units have you worked when in the police

25   department?

1  **A.**  Two different precincts and one specialized unit in

2  Carolina.

3  **Q.**  What is your current rank?

4  **A.**  Sergeant.

5  **Q.**  So you said you've been working for the past years for the

6  Carolina Motor Unit?

7  **A.**  Correct.

8  **Q.**  What are your duties in that unit?

9  **A.**  To supervise the guys, my agents, the officers on

10  motorcycles.

11  **Q.**  So are you familiar with the facts of an investigation

12  into an individual by the name of Josean Domenech Robles?

13  **A.**  A little.

14  **Q.**  Can you please tell us what you remember happened on

15  August 11, 2017, regarding Mr. Domenech Robles that brings us

16  before this court here today?

17  **A.**  Well, that day, evening, I was collecting the work

18  performed by the guys during the day.

19         **MS. ROSEN:**  Objection, Your Honor, hearsay.

20         **THE COURT:**  It's only admitted for the purpose of

21  what Mr. Hernández said.

22         **THE INTERPRETER:**  And I heard on the radio Officer

23  Hernández state, "He's refusing to stop in direction towards

24  the El Comandante."

25

1  **BY MR. BARROSO:**

2  **Q.** Wait, clarify that. In direction to where?

3  **A.** The El Comandante Avenue there in Carolina.

4  **Q.** So where were you initially when you heard through the

5  radio that he wouldn't stop?

6  **A.** In front of the Sabana Abajo Elementary School.

7  **Q.** Why would you do those shift changes there?

8          **THE INTERPRETER:** Why would you do?

9          **MR. BARROSO:** Those shift changes there.

10          **THE WITNESS:** Well, this is a high crime location,

11  and our presence there minimizes any illegal activity in the

12  area.

13  **BY MR. BARROSO:**

14  **Q.** How many officers would you say were there while you were

15  conducting this shift change?

16  **A.** Approximately ten.

17  **Q.** So what kind of vehicles were the agents riding at that

18  time?

19  **A.** All of them on motorcycles.

20  **Q.** So when you heard through the radio "He won't stop," what

21  did you do?

22  **A.** Well, I picked up the things that I had, put them in the

23  motorcycle, and continued my way in that direction.

24  **Q.** And what happened then?

25  **A.** I heard on the radio, they said, "He threw it at the

1  second house."

2        **THE COURT:**  Again, admitted only for the purpose of

3  what he said.

4  **BY MR. BARROSO:**

5  **Q.**  Where were you when you heard that?

6  **A.**  On Monserrate Avenue in direction towards Comandante

7  Avenue, before where he -- before turning onto the avenue

8  where he was.

9  **Q.**  So, Officer, are you familiar with the area around Sabana

10  Abajo Housing Project?

11  **A.**  Yes.

12  **Q.**  If I were to show you an aerial picture of the area, would

13  you be able to recognize it?

14  **A.**  Yes, of course.

15        **MS. ROSEN:**  Your Honor, it should be shown to the

16  witness before it's published to the jury.

17        **MR. BARROSO:**  It's an exhibit.

18        **MS. ROSEN:**  It's already an exhibit?

19        **MR. BARROSO:**  Yes, it's already been marked.

20        **MR. BARROSO:**  Permission to approach the witness.

21        Showing the witness Exhibit No. 1.

22  **BY MR. BARROSO:**

23  **Q.**  Do you recognize what is on that picture?

24  **A.**  Yes.

25  **Q.**  Why do you recognize it?

1  **A.**  I work in that area.

2  **Q.**  Please, using that exhibit as reference, please mark where

3  you were doing the shift change?

4  **A.**  Here.

5  **Q.**  Please circle it.

6  **A.**  (Witness complies.)

7  **Q.**  So when you heard that "he won't stop, he won't stop,"

8  which direction did you drive in?

9  **A.**  Toward that area.

10  **Q.**  And where were you exactly when you heard over the radio

11  *la tiro*?

12  **A.**  Around this area.

13  **Q.**  So what happened then?

14  **A.**  I continued my way toward Comandante Avenue and I went up

15  this little slope on the sidewalk.  I drove on the sidewalk,

16  and at the second house, in front of the house, I was able to

17  make out a firearm.

18  **Q.**  How was the illumination that night?

19  **A.**  It was lit up because of the pole, the light from the

20  light poles.

21  **Q.**  So you found a gun where exactly?

22  **A.**  In front of a -- a planter, some grass that there was on

23  the ground in front of the house.

24  **Q.**  If I were to show you a picture of that gun, would you be

25  able to identify it?

1  **A.**  Of course.

2          **MR. BARROSO:**  Showing the witness Exhibit No. 3.

3  **BY MR. BARROSO:**

4  **Q.**  Sergeant, do you recognize what is on the image?

5  **A.**  Yes.

6  **Q.**  What is it?

7  **A.**  That is house number 2 and the firearm that I saw that

8  night.

9  **Q.**  So when you saw the firearm, what did you do?

10 **A.**  I stopped and informed Officer Hernández I had a firearm

11 in the location.

12 **Q.**  Who else was with you then?

13 **A.**  There were several officers of mine, but I don't remember

14 their names.

15 **Q.**  Who was the first person who found the weapon?

16 **A.**  Me.

17 **Q.**  And who was the person who finally took custody of the

18 weapon?

19 **A.**  Officer Hernández.

20 **Q.**  If you see that gun, would you be able to recognize it?

21 **A.**  I could.

22         **MR. BARROSO:**  Could I have Exhibit No. 4.

23         Permission to approach, Your Honor.

24 **BY MR. BARROSO:**

25 **Q.**  Sergeant, please examine what I have shown you.

1      Do you recognize what that is?

2  **A.**  Yes.

3  **Q.**  What is it?

4  **A.**  A firearm.

5  **Q.**  What type?

6  **A.**  Smith & Wesson.

7  **Q.**  And how does that gun that you're holding in your hand

8  compare to the weapon you found lying on the grass that night

9  on August 11, 2017?

10 **A.**  Yes, it's the same one.

11 **Q.**  How do you know?

12 **A.**  When Officer Hernández lifted the firearm, we were able to

13 observe that it didn't have a serial number engraved, it was

14 mutilated.

15      **MR. BARROSO:**  One second, Your Honor.

16 **BY MR. BARROSO:**

17 **Q.**  How long did you keep custody of the weapon until Agent

18 Hernández came and took care of it?

19 **A.**  Approximately 30 minutes.

20 **Q.**  Other than the gun, what else was found there that night;

21 do you remember?

22 **A.**  No, me, just the gun.

23 **Q.**  When you say you, just the gun, what do you mean by that?

24      **MS. ROSEN:**  Objection, Your Honor, he asked, he

25 answered.  He only found the gun.

1    **THE COURT:**  No, he can clarify.

2    **BY MR. BARROSO:**

3    **Q.**  Would you please clarify what you mean that, you, only the

4    gun?

5    **A.**  Well, when I saw the firearm, I notified it and stayed on

6    the motorcycle, I didn't ...

7    **Q.**  Did you search the surrounding area?

8    **A.**  No.

9    **Q.**  In situations like this, there is a unit of the police

10   called *Servicios Técnicos* which usually takes custody of such

11   things.  Were they called in this instance?

12   **A.**  I do remember having called, yes.

13   **Q.**  Did they come, though?

14   **A.**  No.

15   **Q.**  And why did Agent Hernández -- why was Agent Hernández the

16   one that took custody of the weapon?

17   **A.**  I understood he was the initial officer, and technical

18   services was not available.

19   **Q.**  Did you have any other role in this investigation?

20   **A.**  No, nothing else.

21   **Q.**  Were you present at the precinct later on while the

22   arrestees were being processed?

23   **A.**  Well, I was at the unit, but I would come in and out doing

24   my duties.

25        **MR. BARROSO:**  Sergeant, thank you very much for your

1  time.  We have no further questions for this witness.

2           **THE COURT:**  Cross.

3           **MR. BARROSO:**  I'm handing the exhibits back.

4           **MS. ROSEN:**  May I have the exhibits?

5           May I approach to retrieve the exhibits?

6           **THE COURT:**  Yes.

7                      CROSS-EXAMINATION

8  **BY MS. ROSEN:**

9  **Q.**  Good morning, Sergeant Marcano.

10  **A.**  Good morning.

11  **Q.**  This event took place on August 11th of 2017?

12  **A.**  Yes.

13  **Q.**  And you didn't take any notes that night?

14  **A.**  No.

15  **Q.**  And you didn't write any reports?

16  **A.**  No.

17  **Q.**  So all of your testimony today is based on your memory?

18  **A.**  Correct.

19  **Q.**  Your memory of an event that took place almost a year ago?

20           **THE INTERPRETER:**  The interpreter needs a repetition.

21  **BY MS. ROSEN:**

22  **Q.**  I'm sorry.

23           Your memory of an event that took place almost a year ago?

24  **A.**  Correct.

25  **Q.**  And any preparation you did to testify today.

1    **A.**  Preparation, in what sense?

2    **Q.**  Did you prepare to testify today?

3    **A.**  Of course, I did mental exercises.

4    **Q.**  Okay.  Now, you testified on direct examination that when

5    you went to the scene of the gun -- the area where you found

6    the gun, it was lit up.

7    **A.**  Yes.

8    **Q.**  I'm showing you what's been previously marked as

9    Government's Exhibit 3.  And you previously identified this as

10   the gun you seized that night.

11         Now, in the left-hand corner of that picture there's a

12   light fixture, correct?

13   **A.**  Yes.

14   **Q.**  And that light is not on?

15   **A.**  I'm not seeing that light.

16   **Q.**  I'm directing you -- there's two windows, correct, in the

17   picture?

18   **A.**  Yes.

19   **Q.**  And near the top, there's a light fixture, correct, in

20   between the two windows?

21   **A.**  Yes.

22   **Q.**  And that light is not on; is it?

23   **A.**  That's right, at the time of the picture.

24   **Q.**  Okay.  And there is light in the photo, correct?

25   **A.**  Yes.

RAMON MARCANO - (CROSS BY MS. ROSEN)

1    Q.  But that light is from your motorcycles?

2    A.  Several motorcycles.

3    Q.  Okay.  And the several motorcycles' lights create a circle

4    of light, correct?

5    A.  Yes, that's right.

6    Q.  And outside the circle of light, it's dark?

7    A.  Correct.

8    Q.  Now, you also testified that the gun here today was the

9    same gun because the serial number was obliterated?

10   A.  Yes.

11   Q.  Now, Smith & Wessons are common guns; are they not?

12   A.  Yes.

13   Q.  In fact, they are given to police officers who graduate

14   the academy?

15   A.  Yes.

16   Q.  Now you, I'm sure, have arrested people for having a gun

17   with an obliterated serial number?

18   A.  Correct.

19   Q.  So about how many officers were at the scene when you guys

20   found the gun?

21   A.  Well, at the time the gun was found, it was only me, then

22   the others arrived.

23   Q.  How soon after you got there did the other police officers

24   arrive?

25   A.  Seconds.

RAMON MARCANO - (CROSS BY MS. ROSEN)

1  **Q.** Okay. And then you waited another 30 minutes before

2  Officer Hernández came back?

3  **A.** Correct.

4  **Q.** And during that time, you didn't search the area?

5  **A.** No.

6  **Q.** Did any of the officers you were with search the area?

7  **A.** No, not that either, it's not part of my duties.

8      **MS. ROSEN:** May I have moment, Your Honor?

9      May I approach to get ID stickers?

10     Your Honor, may I approach the witness to show him

11 what's been marked as ID Defense 2, 3 and 4.

12     **THE COURT:** Yes.

13 **BY MS. ROSEN:**

14 **Q.** Now, Officer, I'm handing you three photos. The first

15 photo is marked as ID 3. Do you recognize that photo?

16 **A.** Yes.

17 **Q.** And what is that a picture of?

18 **A.** The corner of Comandante Avenue and Monserrate Avenue.

19 **Q.** Does that fairly and accurately represent the streets as

20 they existed on the night we're speaking about?

21 **A.** Yes.

22     **MS. ROSEN:** May I approach the witness, Your Honor?

23     Permission to publish, Your Honor.

24 **BY MS. ROSEN:**

25 **Q.** Now, the second photo in your hand, do you recognize that

 1  photo?

 2  **A.**   Yes.

 3  **Q.**   What is that a photo of?

 4  **A.**   It is the same one except it's taken from up above.

 5  **Q.**   And does that fairly and accurately represent the roads as

 6  they existed on the night you testified about?

 7  **A.**   Yes.

 8          **MS. ROSEN:**  May I approach the witness, Your Honor?

 9  **BY MS. ROSEN:**

10  **Q.**   And the final photo in your hand, do you recognize that

11  photo?

12  **A.**   Yes.

13  **Q.**   What's that a photo of?

14  **A.**   That's the second house there is on the avenue.

15  **Q.**   Does it, to your knowledge, fairly and accurately

16  represent the house as it existed on the nights of these

17  events?

18  **A.**   Correct.

19          **MS. ROSEN:**  May I approach, Your Honor?

20          Any objections?

21      **MR. BARROSO:**  No.

22          **MS. ROSEN:**  May I publish to the jury, Your Honor?

23      **THE COURT:**  Yes, it's going to be Defense Exhibits --

24      **THE CLERK:**  2, 3 and 4.

25

1  **BY MS. ROSEN:**

2  **Q.**  Now, I'm showing you what's been marked as Defendant's

3  Exhibit 2.  The house where the events occurred is where on

4  the photo?

5  **A.**  This one.

6  **Q.**  The second house?

7  **A.**  Yes.

8  **Q.**  Now, on the corner there's a wooded area, correct?

9  **A.**  Correct.

10  **Q.**  With trees?

11  **A.**  Yes.

12  **Q.**  Bushes?

13  **A.**  Yes.

14  **Q.**  Now, I'm showing you what's been marked as Defendant's

15  Exhibit 4, and that's an aerial view of the roads, Monserrate

16  and Comandante?

17  **A.**  Yes.

18  **Q.**  And this picture shows the large wooded area on the

19  corner, correct?

20  **A.**  Correct.

21  **Q.**  Finally, I'm showing you what's been marked as Defendant's

22  Exhibit 3.

23  **A.**  Yes.

24  **Q.**  And this shows the corner you turned that night?

25  **A.**  Correct.

1  **Q.**  And this picture shows the long wide wooded area that

2  encompasses the corner?

3  **A.**  Yes.

4        **MS. ROSEN:**  May I have a moment, Your Honor?

5        No further cross, Your Honor.

6        **THE COURT:**  Do you have any redirect?

7        **MR. BARROSO:**  No, Your Honor.

8        **THE COURT:**  So the witness is excused.

9        **MR. BARROSO:**  Your Honor, the next Government witness

10 is Special Agent Jose Burgos, he's standing right outside.

11        **THE CLERK:**  Raise your right hand, please.

12        **JOSE BURGOS, GOVERNMENT WITNESS, SWORN IN**

13                    DIRECT EXAMINATION

14 **BY MR. BARROSO:**

15 **Q.**  Good morning, sir.

16 **A.**  Good morning, sir.

17 **Q.**  Please state your name for the record.

18 **A.**  I'm Special Agent Jose Burgos, B-U-R-G-O-S.

19 **Q.**  You're special agent for which federal agency?

20 **A.**  The Bureau of Alcohol, Tobacco, Firearms and Explosives,

21 better known as ATF.

22 **Q.**  How long have you been a special agent for ATF?

23 **A.**  Since May of 2002, for 16 years now.

24 **Q.**  What does ATF do exactly?

25 **A.**  We enforce the federal firearms laws and also the arson

 1   laws and explosives.

 2   **Q.**  What kind of training do you have to go through to become

 3   a federal agent?

 4   **A.**  We have to take the criminal investigation academy, it's a

 5   three-month course, and then the new professional training, or

 6   how now it's called, Special Agent Basic Training, it's

 7   another three months.

 8   **Q.**  So after you became a special agent for ATF, what are your

 9   day-to-day duties at the agency?

10   **A.**  Conduct violent crime investigations involving the use of

11   firearms.  Also I'm one of the interstate nexus experts of the

12   office.

13   **Q.**  You're one of the interstate nexus experts of the office.

14       Can you please explain to the ladies and gentlemen of the

15   jury exactly what that is?

16   **A.**  An interstate nexus expert examines firearms and/or

17   ammunition and conducts research in order to make a

18   determination as to where they were manufactured and if they

19   traveled in or affecting interstate commerce.

20   **Q.**  And how does one become an expert in such a field?

21   **A.**  You have to take the Interstate Nexus Basic Training, it's

22   a one-week course where you have to take two tests, one at the

23   beginning of the training, one at the end.  They are pass or

24   fail tests.  If you don't pass, you don't graduate.

25   **Q.**  Did you take these tests?

1  A.  Yes, sir.

2  Q.  When?

3  A.  On September 2006, I took the training.

4  Q.  September 2006.  Is that -- do you get some sort of

5  certification when you take this training?

6  A.  Yes, sir.

7  Q.  And I ask you, do you have to renew the certification for

8  being an expert at interstate nexus?

9  A.  No, sir.  You just need to maintain examining firearms

10  and/or ammunition and conducting the -- or preparing the

11  reports.

12  Q.  So you said that you took these courses in 2006?

13  A.  Yes, sir.

14  Q.  How do you keep up to date with the latest developments in

15  this field?

16  A.  Well, we have access to what we call the "J" file, it's a

17  drive on our computers where only interstate nexus expert has

18  that access to, and there we receive information related to

19  new information in reference to firearms and/or ammunition,

20  and it also contains information that help us doing this

21  research and making the determination on the specific firearms

22  and ammunition.

23  Q.  So how many experts -- how many interstate nexus experts

24  work for ATF in Puerto Rico, do you know?

25  A.  Four.

 1  **Q.**  Four of them?

 2  **A.**  Yes, sir.

 3  **Q.**  And you've been one of them since 2006?

 4  **A.**  Yes, sir.

 5  **Q.**  So I assume you've examined many firearms?

 6  **A.**  Thousands of firearms.

 7  **Q.**  Thousands of firearms.

 8      So what constitutes the examinations that you go through

 9  in order to determine the origin of a firearm?

10  **A.**  We examine the firearms, we obtain the manufacturer, the

11  model, the caliber, the serial number, and in some cases the

12  importer, and also the proof marks or any other marks in the

13  firearm or the ammunition, depending what we're examining.

14  **Q.**  Is part of your examination examining the serial numbers

15  of the firearms?

16  **A.**  Yes, sir.

17  **Q.**  What is the purpose of serial numbers in a gun?

18  **A.**  To conduct a comprehensive tracing of the firearm, that

19  way we can obtain the information, who was the manufacturer,

20  the retailer and the legal owner, or the final legal owner

21  that purchased that firearm.

22  **Q.**  Have you ever examined a firearm with an obliterated

23  serial number?

24  **A.**  Yes, sir, many.

25  **Q.**  What would be the purpose of obliterating said number?

 1          **MR. MICHELEN:**  Objection as to speculation.

 2          **MR. BARROSO:**  Your Honor, he's an expert on the

 3    field.

 4          **MR. MICHELEN:**  Calling for relevance and speculation,

 5    lack of foundation; how would he know what the purpose of

 6    obliterating the firearm (sic)?

 7          **MR. BARROSO:**  Your Honor, he's an expert in the field

 8    of firearms' examination.

 9          **THE COURT:**  He has not yet been qualified.  You can

10    voir dire, you know, for the time being.

11          **MR. MICHELEN:**  If he's going to testify about that,

12    then I think there should be a foundation laid as to how he

13    would know the relevance of a firearm being obliterated.

14          **THE COURT:**  Why don't you ask him that.

15          **MR. BARROSO:**  I don't understand the defense

16    objection, how would he know the relevance; as to what?

17          **MS. ROSEN:**  Your Honor, may we approach at sidebar?

18          **(At sidebar on the record.)**

19          **MS. ROSEN:**  Your Honor, if the Government is trying

20    to elicit the various purposes, the bad reasons someone might

21    obliterate a serial number, then we would certainly object to

22    that testimony.  It's completely irrelevant to the elements of

23    the crime charged, and they would be using it as, in effect,

24    character evidence to try to paint a bad light on our client.

25          So we're not objecting to the fact that the serial

1 number was obliterated, they're going to prove that, but

2 there's no need for this expert to pontificate, to guess why

3 someone might obliterate a serial number.  And even if they did

4 obliterate the serial number and this expert testified about

5 that, they're trying to inject character evidence about the

6 type of people who obliterate serial numbers, which is

7 irrelevant to whether the serial number was in fact

8 obliterated.

9       **MR. BARROSO:**  Your Honor, what I am asking is what

10 would a reason for -- a general reason for obliterating a

11 firearm (sic); it has no relevance as to the character of

12 their client.  Either way, Your Honor, the fact that it does

13 not look good for a client does not mean that it is not

14 relevant to this examination, Your Honor.

15       He's a firearms' expert, Your Honor.  He has stated

16 that he's examined thousands of firearms.  He's in a position

17 to tell the members of the jury exactly what purpose would it

18 serve to obliterate a serial number, Your Honor, which is one

19 of the -- it's exactly one of the charges that their client is

20 facing.

21       **MS. ROSEN:**  No, the element is the number

22 obliterated.

23       **MR. MICHELEN:**  Period.

24       **MS. ROSEN:**  Period.  That's it.

25       **MR. BARROSO:**  I don't have to prove only the element,

 1  Your Honor.

 2          **MR. MICHELEN:**  Your Honor, moreover, there has been

 3  no foundation as to whether how he would know reasons.

 4  There's no foundation as to the courses he's taken, psychology

 5  courses he's taken on why people would do such a thing.  He

 6  may be an expert as to firearms, but there's no foundation as

 7  to why somebody would do that.  That's a whole different set

 8  of skills someone would potentially need, number one.  And

 9  what are the potential answers he can give?  Well, because

10  they don't want to be traced, I mean, it's not rocket science.

11          **MR. BARROSO:**  That's the reason, they don't want to

12  be traced.

13          **MR. MICHELEN:**  And that is improper character

14  evidence, which he has no idea of.

15          **MS. ROSEN:**  And it's prejudicial under 403.  It's not

16  relevant, A.  And B, if you go to the balancing test under

17  403, it doesn't add anything to the Government's case.

18          The determinative question is, was it obliterated and

19  did he know it was obliterated.  But why people obliterate

20  serial numbers doesn't --

21          **THE COURT:**  Have you asked him concerning the fact

22  whether he is familiar with obliterated serial numbers?

23          **MR. BARROSO:**  Yes, Your Honor.

24          **THE COURT:**  And the training that he has had with

25  respect to that?

 1          **MR. BARROSO:**  We can ask, Your Honor.

 2          **THE COURT:**  You should ask him about that.  Then you

 3   have to establish that foundation first.

 4          **MR. BARROSO:**  Well, we asked if he had examined --

 5          **THE COURT:**  And then you can, after that, you know,

 6   you have to qualify him as an expert, and then he can examine

 7   the gun and say whatever opinion he has.

 8          **MR. MICHELEN:**  But again, Your Honor, it would not be

 9   an expert opinion as to why the firearm (sic) was obliterated.

10   There is no -- there is no way you can have expert

11   experience -- expertise on why someone would do that.  That is

12   a whole different field.  That is not firearms' field.  That

13   is psychology, that is human psychology.

14          **MR. BARROSO:**  Well, they can bring that out on cross,

15   Your Honor.

16          **THE COURT:**  You can bring that out in cross, whether

17   he has that type of training or whatever.  You can ask him

18   about that.

19          **MR. BARROSO:**  He can testify as to what effect an

20   obliterated serial number would have on the types of tests he

21   realizes on the weapon, Your Honor.  The fact that that

22   would -- I mean, if he says, for example, that an obliterated

23   serial number prevents me from tracing the weapon back to its

24   owner --

25          **MR. MICHELEN:**  If you ask a question like that, does

1  a firearm being obliterated, how does it affect the tests that

2  you do, that's a different question --

3          **MS. ROSEN:**  Than why would someone obliterate.

4          **MR. MICHELEN:**  Why would someone do that is a totally

5  different question; it's a question about human psychology.

6  He's not a psychologist, he has no idea.  He's never met our

7  client.  He's never interviewed him.  He's never analyzed him.

8          So he can say what effect does an obliterated serial

9  number have on the type of tests you can do.  You can ask him.

10          He'll say, well, I can't do a particular test because

11  I don't have a serial number.  Great, that's it.  But there's

12  no reason he should be able to, as an expert, talk about why

13  someone would do that, because once the Court qualifies him as

14  an expert, anything else that he says, the jury is not going to

15  be able to differentiate this is just someone giving their

16  opinion versus him as an expert.

17          **MR. BARROSO:**  If I bring a narcotics' expert, for

18  example, a gang expert, and I ask him, "Why would somebody

19  pack the drugs this way," Your Honor, that is a particular

20  answer to a question, and it doesn't have nothing to do with

21  human psychology, Your Honor, it's just the practical aspect

22  of doing the action, not what the person is thinking as he's

23  doing it, Your Honor.

24          **MS. ROSEN:**  Well, there's a distinct difference

25  between the psychological -- in response to your question of

1    this witness -- and like the actual packaging of drugs, and

2    that's the difference I think Mr. Michelen is pointing out.

3    You package drugs a certain way as a task over and over again

4    for a discreet purpose; like why any given person chooses to

5    do an infraction that's done in itself, like removing

6    something, pushing something, whatever, it ends there.

7         **MR. BARROSO:**  But I didn't ask for examples of why

8    somebody would do it.  I'm not asking for a reason that this

9    particular defendant would, but examples of why somebody would

10   do something like that, Your Honor, this is the perfect person

11   to ask.

12        **MR. MICHELEN:**  Even an expert cannot testify about,

13   speculate as to why somebody would do it unless he can lay a

14   foundation as to how he would know why people do that.  If

15   he's going to say, I took courses on criminal elements and how

16   people commit crimes and, you know, 90 or whatever percent of

17   people do it for pay, if he can say that, sure.  But he is not

18   an expert on that.  There's no basis.  There's no foundation

19   for that.

20        If the Government can lay a foundation for how he

21   knows how humans react --

22        **THE COURT:**  Well, on the basis of his experience, you

23   have to ask him, explore concerning his experience with

24   respect to guns that the serial numbers have been obliterated.

25        First of all, if that obliteration comes as a matter

1  of wear and tear.  Secondly, whether that obliteration simply

2  is, you know, there's being some human element concerning the

3  fact that it has been like scratched out, and then what is the

4  purpose of that.  The purpose of that probably is not to, what,

5  trace it, or do whatever it is.

6       **MR. BARROSO:**  That's what we're asking, Your Honor.

7       **MR. MICHELEN:**  There's a difference, Your Honor,

8  between what is the purpose versus what effect does an

9  obliterated serial number have on the type of tests you can

10  perform.

11       **MS. ROSEN:**  And then they can argue purpose in their

12  closing.  This expert shouldn't --

13       **MR. MICHELEN:**  An expert shouldn't be able to say

14  that, shouldn't be able to say why something would happen if

15  he's not an expert.

16       The Government can ask him what effect does an

17  obliterated serial number have on types of tests you can

18  perform?  And he can say, well, when there's no serial number,

19  I can't do test X and Y.  Okay, great.  They can then argue --

20       **THE COURT:**  First of all, we have to find out how

21  that is obliterated and if he has that type of training.

22  Okay?

23       And, secondly, what is the effect of the obliteration,

24  as he says.  Can you do that?

25       **MR. BARROSO:**  Yes, Your Honor, let me continue.  And

1 if the issue re-arises, we will ...

2         (End of sidebar.)

3 **BY MR. BARROSO:**

4 **Q.** Mr. Burgos, I'm going to ask you a different question.

5    How does an obliterated serial number impair or hinder

6 your ability to do your job, to do these types of tests?

7 **A.** Well, when they erase or obliterate the serial number, it

8 makes it difficult to trace the firearm in order to obtain the

9 last retailer or the last legal owner.

10    If we have that information, we can obtain, you know, who

11 was the last legal owner, and, for instance, if the firearm

12 was possessed in Puerto Rico, we can interview that person and

13 ask if he knows the person that the firearm was recovered

14 from.

15 **Q.** As part of your training to examine these types of

16 firearms, do you take any specific courses in serial number,

17 tracing weapons, or anything to do with that particular

18 markings on the handguns?

19 **A.** Well, we receive training in terms of when a firearm is

20 missing the serial number, if it was obliterated, how it was

21 obliterated, and that type of information, yes, we do.

22      **MR. BARROSO:** Your Honor, I'd like for this witness

23 to be qualified as an expert at this time.

24      **MR. MICHELEN:** No objection, Your Honor.

25      **THE COURT:** Very well. So the witness is qualified

1  as an expert.

2  **BY MR. BARROSO:**

3  **Q.**  So can you please show the witness Exhibit No. --

4          **THE CLERK:**  4.

5          **MR. BARROSO:**  Yes.

6  **BY MR. BARROSO:**

7  **Q.**  Mr. Burgos, do you recognize what I have just shown you?

8  **A.**  Yes, sir.

9  **Q.**  Why?

10 **A.**  It's the firearm that I examined on December 15, 2017,

11 related to this case.

12 **Q.**  Can you tell us what constituted your examination and what

13 your findings were?

14 **A.**  Well, it says Smith & Wesson pistol, where the model and

15 the serial number are obliterated, and the caliber, it's in

16 the barrel, it says 9 millimeter.

17 **Q.**  So you say that the serial number is obliterated.  In that

18 particular weapon, the type of damage that the serial number

19 has, could it come from normal wear and tear?

20 **A.**  No, sir.

21 **Q.**  So, in your expert opinion, how did that damage come to

22 be?

23 **A.**  In my opinion, it was tried to -- well, it was erased

24 probably using a grinder or some type of machine like that.

25 **Q.**  Those serial numbers, are they engraved or imprinted onto

1    the body of the gun?

2    A.   On this case, they were imprinted.

3    Q.   Imprinted.  And how hard is it to get rid of them?

4    A.   It's hard.

5    Q.   Could I just rub on it and will it come off?

6    A.   No, sir.

7    Q.   Okay.  So we know that the serial number was obliterated.

8         What about the procedence (sic) of the weapon, was it

9    manufactured here in Puerto Rico?

10   A.   No.

11   Q.   Are any legal firearms manufactured here in Puerto Rico?

12   A.   No, sir.

13   Q.   Where was this particular model manufactured?

14   A.   This one was manufactured by Smith & Wesson in

15   Springfield, Massachusetts.

16   Q.   And then how did it arrive here in Puerto Rico?

17   A.   It traveled in or affecting interstate commerce.

18        MR. BARROSO:  One second, Your Honor.

19        May we approach, Your Honor?

20   BY MR. BARROSO:

21   Q.   After you examined this weapon, did you prepare any type

22   of report regarding the examinations that you did?

23   A.   Yes, sir.

24        MR. BARROSO:  Your Honor, I have no more questions

25   for this witness.

1        **THE COURT:**  Okay.  Cross.

2        **MR. MICHELEN:**  Thank you, Judge.

3                    <u>CROSS-EXAMINATION</u>

4   **BY MR. MICHELEN:**

5   **Q.**  Agent, good morning.

6   **A.**  Good morning, sir.

7   **Q.**  I want to just clarify a few things you said.  You've been

8   an expert in Puerto Rico -- you've been a firearms' expert in

9   Puerto Rico since 2006, right?

10  **A.**  Interstate nexus expert.

11  **Q.**  Interstate nexus expert, all right.

12       You said you've examined thousands of firearms?

13  **A.**  Yes, sir.

14  **Q.**  In your time examining firearms, have you ever found a

15  firearm that was produced in Puerto Rico?

16  **A.**  No, sir.

17  **Q.**  Because guns -- no firearm is produced in Puerto Rico?

18  **A.**  Legally, no.

19  **Q.**  So every time you're handed a firearm and told to examine

20  it, you already know the answer?

21  **A.**  Not necessarily.

22  **Q.**  Because someone may be producing firearms in Puerto Rico

23  without you knowing it?

24  **A.**  No.  There was a manufacturer company in Puerto Rico in

25  the '70s.

1 **Q.** But it's 2018.

2 **A.** Yes, sir.

3 **Q.** So my question is since 2006, every time you've received a

4 firearm, you've already known what the results of your exams

5 will be, right?

6 **A.** Most of the firearms are not manufactured in Puerto Rico,

7 but there were firearms manufactured in Puerto Rico.

8 **Q.** But are there any firearms manufactured in Puerto Rico

9 now?

10 **A.** No, sir.

11 **Q.** Now, you said you've examined thousands of firearms,

12 right?

13 **A.** Yes, sir.

14 **Q.** You've examined Smith & Wessons before?

15 **A.** Yes, sir.

16 **Q.** You've examined firearms with obliterated serial numbers

17 before?

18 **A.** Yes, sir.

19 **Q.** Hundreds of them?

20 **A.** Thousands of them.

21 **Q.** Thousands of them.

22    You've examined Smith & Wessons with obliterated serial

23 numbers before?

24 **A.** Yes, sir.

25 **Q.** Now, this is the only test you performed, right, in this

 1  case?

 2  A.   It's a research.

 3  Q.   The research.  This is the only research you performed in

 4  this case?

 5  A.   Yes, sir.

 6  Q.   Check whether the firearm was produced in Puerto Rico.

 7  A.   Yes, sir.

 8  Q.   Do you still have the gun?

 9  A.   Yes, sir.

10  Q.   Can you hold it up for the jury, please.

11  A.   (Witness complies.)

12  Q.   Are you wearing gloves?

13  A.   No, sir.

14  Q.   So it's fair to say if we were to conduct -- let me back

15  up.  You've been holding it for a few minutes now, right?

16  A.   Yes, sir.

17  Q.   With both of your hands?

18  A.   Yes, sir.

19  Q.   Different parts of the gun?

20  A.   Uh-huh.

21  Q.   The barrel?

22  A.   Yes, sir.

23  Q.   The magazine?

24  A.   Yes, sir.

25  Q.   The handle?

1    A.  Yes, sir.

2    Q.  If we were to do a fingerprint test, your fingerprints may

3    come out?

4           MR. BARROSO:  Objection, Your Honor.  Objection, Your

5    Honor.  This is not a fingerprint expert.  He has no idea what

6    would happen if they were to do a fingerprint analysis.

7           He is an interstate nexus expert, Your Honor.

8           MR. MICHELEN:  If he knows.

9           MR. BARROSO:  We object to the question, Your Honor.

10          THE COURT:  Have you been involved in fingerprint

11   examinations before?

12          THE WITNESS:  No, sir.

13          THE COURT:  Okay.  That's it.

14   BY MR. MICHELEN:

15   Q.  You've heard of fingerprint testing, right?

16          MR. BARROSO:  Objection, Your Honor.

17          MR. MICHELEN:  It's a separate question.

18          MR. BARROSO:  This line of questions is completely

19   outside the scope of the direct examination, Your Honor.

20          THE COURT:  It is.

21   BY MR. MICHELEN:

22   Q.  Agent, you are Special Agent Burgos, right?

23   A.  Yes, sir.

24   Q.  You're not a task force officer?

25   A.  No, sir.

JOSE BURGOS - (CROSS BY MR. MICHELEN)

1   Q.  You are also not the lead agent in this case?

2   A.  No, sir.

3   Q.  You're not familiar with any of the actual facts of what

4   happened that night?

5   A.  No, sir.

6   Q.  The lead agent in this case is Agent Paduil Torres, right?

7   A.  Yes, sir.

8   Q.  He's the one that gave you the gun and asked you to

9   examine it?

10  A.  Yes, sir.

11  Q.  And you did that on December 15, 2017?

12  A.  Yes, sir.

13  Q.  So three, four months after the actual events happened?

14  A.  Yes, sir.

15          MR. MICHELEN:  One second, please.

16          No further questions.  Thank you, Agent.

17          MR. BARROSO:  One second, Your Honor.

18          We have no redirect, Your Honor.

19          THE COURT:  Okay.  The witness is excused.

20          MR. BARROSO:  May we approach, Your Honor?

21          (At sidebar on the record.)

22          MR. BARROSO:  Your Honor, in this case I'm not sure

23  if the stipulation that the defendant has filed has already

24  been read to the jury.  I think it was part of the jury

25  instructions.

1      **MS. ROSEN:**  It was part of the preliminary.

2      **MR. BARROSO:**  That's one of the elements.

3      **THE COURT:**  Was it read?

4      **MS. ROSEN:**  Judge Lopez read it.

5      **THE COURT:**  Oh, he read that stipulation.

6      **MS. ROSEN:**  But we have no objection to reading it,

7  if you're worried about it.

8      **MR. BARROSO:**  If we're going to rest, we would like

9  that to be read to the jury.

10      (Document handed to the Court.)

11      **THE COURT:**  You have to sign this.

12      **MS. ROSEN:**  Yes.

13      (Pause.)

14      **THE COURT:**  Everybody has signed it.

15      (End of sidebar.)

16      **THE COURT:**  I'm going to read to you now a

17  stipulation that has been signed by counsel for defendants and

18  also by the counsel for the Government, and this stipulation

19  is in lieu of any evidence that may be presented.  It will be

20  part of what you have in order to, when the time comes, to

21  start your deliberations, and you're to give it whatever

22  weight you'd like to give it.  Okay?

23      And it reads as follows.  There's a caption, the

24  caption of the case, United States of America, Plaintiff, vs.

25  Josean Domenech Robles, defendant.  And then the case is

1  identified, Criminal No. 17-498.  There's some initials there

2  which are the initials of this Judge.

3      And it reads as follows, "Stipulation Regarding

4  Defendant's Prior Felony Conviction.

5      "To the Honorable Court:  It is hereby stipulated and

6  agreed by the undersigned parties, subject to approval and

7  entry by the Court, that prior to August 11, 2017, Mr. Josean

8  Domenech Robles had been convicted in a court of the United

9  States of a crime punishable by a term of imprisonment

10  exceeding one year, a required element of the offense.  No

11  further evidence will be necessary to this effect, that is, the

12  jury is to accept the stipulation as a proven fact."

13      And then it's, "Respectfully submitted, San Juan,

14  Puerto Rico, July 17, 2018."

15      And then signed by Omar Barroso, Assistant U.S.

16  Attorney; Juan J. Michelen, attorney for the defendant, and

17  then by defendant himself, Josean Domenech, defendant.

18      Very well.  So it will be part of what you will have

19  in the jury room when you start your deliberations.

20      So, the Government.

21      **MR. BARROSO:**  Your Honor, at this point the

22  Government has no more witnesses to call, so we rest our case,

23  Your Honor.

24      **THE COURT:**  You are resting your case at this time.

25  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

1    **THE COURT:**  You may be seated.  The Government has

2    rested.  Now the defense will call a witness.

3    **MS. ROSEN:**  The defense calls Agent Torres.

4    **THE CLERK:**  Raise your right hand, please.

5    **PADUIL TORRES MENDEZ, DEFENSE WITNESS, SWORN IN**

6    DIRECT EXAMINATION

7    BY MS. ROSEN:

8    **Q.**  Agent Torres, could you introduce yourself to the jury.

9    **A.**  My name is Paduil Torres Mendez.

10   **Q.**  And you're a task force officer?

11   **A.**  Yes, the ATF task force.

12   **Q.**  And you've been a task force officer for 17 years?

13   **A.**  Yes.

14   **Q.**  And before that, you worked for the police of Puerto Rico?

15   **A.**  Yes.

16   **Q.**  And you were a police officer for 16 years?

17   **A.**  Well, total, it would be 30 years, 17 with ATF and 13 with

18   the police department.

19   **Q.**  I'm sorry, 13.  So I assume you received training when you

20   were a police officer?

21   **A.**  That's correct.  In 1987 --

22   **THE INTERPRETER:**  The interpreter would like to have

23   the response repeated.

24   **A.**  -- six months in the police academy of the police of

25   Puerto Rico.

PADUIL TORRES - (DIRECT BY MS. ROSEN)

1   Q.  And I assume you also received training when you became a

2   task force officer?

3   A.  Correct.

4   Q.  On how to investigate firearms' cases?

5   A.  Correct.

6   Q.  On how to preserve evidence in firearms' cases?

7   A.  Yes.

8   Q.  And how to document your investigations in firearms'

9   cases?

10  A.  Correct.

11  Q.  Now, you are the case agent in charge of this case?

12  A.  Yes.

13  Q.  And you took notes detailing each part of your

14  investigation?

15  A.  Correct.

16  Q.  And those notes were taken when -- near to the time you

17  investigated?

18  A.  Well, specifically, I took the notes the day after the

19  person was detained.

20  Q.  And that's because that's when what you learned is most

21  fresh in your mind?

22  A.  That is so I can prepare a report, in ATF it's called ROI.

23  Q.  A Report of Investigation?

24  A.  Yes.

25  Q.  And those are important documents?

1    **A.**   Yes.

2    **Q.**   Because they are given to the Government?

3    **A.**   Correct.

4    **Q.**   And the Government uses them to prosecute a case?

5    **A.**   Yes.

6    **Q.**   So, obviously, you're diligent in creating those

7    documents?

8    **A.**   Yes.

9    **Q.**   And you include all the important information about the

10   case in those documents?

11   **A.**   All of the information that is investigated at the time.

12   **Q.**   Okay.  And nowhere did you include the information that

13   you ordered fingerprints on this gun?

14   **A.**   No.

15   **Q.**   And nowhere did you include in a report that you were

16   seeking DNA testing for the gun?

17   **A.**   No.

18   **Q.**   Now, your reports mention Mr. Domenech Robles.  I don't

19   want you to tell me anything about that report other than does

20   it state the name Domenech Robles?

21   **A.**   Yes, it does, in the investigation.

22   **Q.**   And the reports of investigations also include the name

23   Jose Martinez?

24   **A.**   Correct.

25   **Q.**   The driver of the car?

1  A.  Correct.

2  Q.  But the reports also contain the name Peña Vélez.

3  A.  I don't remember.

4  Q.  Would looking at your Report of Investigation refresh your

5  recollection?

6  A.  Yes.

7       MS. ROSEN:  May I approach the witness, Your Honor?

8       THE COURT:  Yes.

9  BY MS. ROSEN:

10 Q.  Have I just handed you one of your reports of

11 investigation?

12 A.  Correct.

13 Q.  I would point -- don't read aloud, but if you could read

14 to yourself paragraph 3 of that report.

15      MS. ROSEN:  May I approach?

16      THE WITNESS:  Yes, I'm ready.

17 BY MS. ROSEN:

18 Q.  Now, does your Report of Investigation include the name

19 Peña Vélez?

20 A.  Not in that report because that's the interview of the

21 person detained.

22 Q.  You just read paragraph 3 of your own report, correct?

23 A.  Yes.

24      MR. BARROSO:  Your Honor, if the defense can clarify,

25 there are numerous reports.

1    **MS. ROSEN:**  I'm sorry, this is what I showed, right

2  there.

3    **MR. BARROSO:**  It's Report of Investigation number 3,

4  the one you're referring to?

5    **MS. ROSEN:**  I guess, yes, Report of Investigation

6  number 3.

7    **MR. BARROSO:**  There are five different ones.  That's

8  why we would like the clarification.

9    **MS. ROSEN:**  I'm sorry, here it is.  This is the

10  paragraph I'm referring to.

11    **MR. BARROSO:**  Okay.

12  **BY MS. ROSEN:**

13  **Q.**  I'm sorry, for clarification, you just looked at Report of

14  investigation 3, correct?

15  **A.**  Correct.

16  **Q.**  And you read paragraph 3, correct?

17  **A.**  Correct.

18  **Q.**  And the name Peña Vélez is written in that paragraph,

19  correct?

20  **A.**  Correct, the last names.

21  **Q.**  And Peña Vélez was not in the car that night?

22  **A.**  Correct.

23  **Q.**  Peña Vélez was not on the scene that night?

24  **A.**  Correct.

25  **Q.**  Peña Vélez is someone you -- Peña Vélez is someone who was

PADUIL TORRES - (DIRECT BY MS. ROSEN)

1   arrested by federal agents 11 days prior?

2   **A.**   I don't know about that, I don't have that information.

3   **Q.**   Well, Officer, aren't you one of the agents that

4   interviewed Peña Vélez on August 2nd of 2017?

5   **A.**   Right now, I don't remember, it's been many cases.

6   **Q.**   I understand.

7        Would looking at your Report of Investigation from that

8   case refresh your recollection?

9   **A.**   I believe so.

10        **MS. ROSEN:**   May I approach the witness, Your Honor?

11   **BY MS. ROSEN:**

12   **Q.**   I am handing you a Report of Investigation labeled number

13   1.

14        **MR. BARROSO:**   Your Honor, sidebar.   We have an

15   objection, but we would like to go to sidebar.

16        **MS. ROSEN:**   Understood, if we can leave the exhibit,

17   sorry, the report with the witness.

18        **(At sidebar on the record.)**

19        **MR. BARROSO:**   Your Honor, we would like to clarify as

20   to what is the relevance of this questioning and what does

21   Peña Vélez -- which is obviously a typo in the report -- have

22   anything to do with this investigation, Your Honor?   Because

23   they're making a big deal out of a typo, that's what it is,

24   Your Honor.

25        **MS. ROSEN:**   It's not just that, there's more; it's a

1   cut and paste, which I think is highly relevant to the jury

2   when they're considering this case.

3          THE COURT:  If he knows.

4          MS. ROSEN:  You can rehabilitate him to see if he was

5   really busy, whatever.

6          MR. BARROSO:  Your Honor, we would like the Court to

7   limit this because we've been going around in circles about a

8   typo.

9          THE COURT:  We'll hear him out.  We are here in

10  search of the truth.

11         (End of sidebar.)

12         MS. ROSEN:  May I begin, Your Honor?

13  BY MS. ROSEN:

14  Q.  Have you finished reviewing that document?

15  A.  Yes.

16  Q.  Now, on August 2nd of 2017, you interviewed Peña Vélez,

17  correct?

18  A.  No.

19  Q.  I'm sorry, you conducted an initial investigation

20  regarding Peña Vélez?

21  A.  No.

22         MS. ROSEN:  May I approach the witness, Your Honor?

23  BY MS. ROSEN:

24  Q.  I'm sorry, would looking at this document refresh your

25  recollection?

1  **A.** Most respectfully, if you verify the information

2  carefully, you'll see that it was Agent Ivis Rosado Diaz, a

3  federal agent, who initiated the investigation.

4  **Q.** Yes, but this report says that you and Agent Rosado

5  conducted an initial investigation related to Mr. Peña Vélez;

6  does it not?

7  **A.** No, the report says that Ivis Rosado, the report is signed

8  by her, conducted the interview and I was present.

9  **Q.** Okay. You were present for the interview of Peña Vélez?

10 **A.** Yes.

11 **Q.** And that was the result of a car stop?

12      **MR. BARROSO:** Your Honor, we object to this line of

13 questioning, it's completely irrelevant, completely

14 irrelevant.

15      **MS. ROSEN:** Two more questions, Your Honor.

16      **THE COURT:** Okay, two more questions.

17 **BY MS. ROSEN:**

18 **Q.** That was a car stopped for tinted windows?

19 **A.** I believe Ivis Rosado would be the one to answer that

20 question for you, she's the one who initiated the

21 investigation.

22 **Q.** But you were there for that interview?

23 **A.** Correct.

24 **Q.** And didn't the officer, during that interview, say they

25 pulled the car over for tinted windows?

1    **MR. BARROSO:** Objection, irrelevant, Your Honor,

2   irrelevant. This is a completely different case, it has

3   nothing to do with Nicolas Peña Vélez, Your Honor, and the

4   officer has already stated that the person who created that

5   report was not even him, it was Special Agent Ivis Rosado,

6   Your Honor.

7    **MS. ROSEN:** I can move on, Your Honor.

8    **THE COURT:** Okay.

9   **BY MS. ROSEN:**

10  **Q.** Now, going back to the ROIs you created in this case --

11  and I don't want you to speak about the contents of the ROIs

12  except for the specific question I'm asking. But in one of

13  your ROIs you mentioned a Honda?

14   **MR. BARROSO:** Your Honor, would the defense clarify

15  the question, there are a number of ROIs.

16   **MS. ROSEN:** I'm sorry, yes.

17  **BY MS. ROSEN:**

18  **Q.** There's a Report of Investigation number 1, correct?

19  **A.** Correct.

20  **Q.** And that Report of investigation has three pages?

21  **A.** Correct.

22  **Q.** And on the last page, you referenced a 2008 Honda Accord.

23  **A.** In one of the attachments.

24  **Q.** And the car for this case was not a Honda Accord?

25  **A.** Page 2 of this report says it was a Toyota Camry and it

 1  was black.

 2  **Q.**  Right.  And there was no Honda Accord involved in this

 3  case?

 4  **A.**  No.

 5  **Q.**  But Peña Vélez was stopped in a Honda Accord?

 6          **MR. BARROSO:**  Objection, Your Honor.  Objection.  The

 7  witness has already stated he has no knowledge.

 8          **THE COURT:**  If he knows, okay.  We have to get this

 9  over, okay?  Answer the question.

10          **THE WITNESS:**  Since it was Ivis Rosado who prepared

11  the report, right now I could not tell you either way.

12          **THE COURT:**  That should be a sufficient answer.

13          **MS. ROSEN:**  Your Honor, can I try to refresh his

14  recollection?

15          **THE COURT:**  Well, he already said he's not familiar

16  with that report, I mean, with what she did.

17          **MS. ROSEN:**  Two questions.

18  **BY MS. ROSEN:**

19  **Q.**  Were you present for the interview -- you were present for

20  the interview?

21          **THE COURT:**  He already answered that.

22  **BY MS. ROSEN:**

23  **Q.**  We know you were present for the interview of Peña Vélez.

24      Would looking at a summary of that interview refresh your

25  recollection?

PADUIL TORRES - (DIRECT BY MS. ROSEN)

1  **A.** If you show me the report, yes.

2  **MR. BARROSO:** Your Honor, that's improper

3  impeachment. He has not adopted that report at all, Your

4  Honor.

5  **MS. ROSEN:** Your Honor, I'm not trying to impeach,

6  I'm trying to refresh his recollection.

7  **THE COURT:** If it's only for refreshing, let's go.

8  **MS. ROSEN:** May I approach, Your Honor?

9  **THE COURT:** Yes.

10  **BY MS. ROSEN:**

11  **Q.** I'm going to pass you the Report of Investigation you

12  previously looked at, and ask you to look at paragraph 3. And

13  look up when you've read that paragraph.

14  Isn't it true that Peña Vélez was in a Honda Accord?

15  **A.** Based on what it says in this report, yes.

16  **MS. ROSEN:** May I approach the witness to retrieve

17  the document?

18  **THE COURT:** Yes.

19  **MS. ROSEN:** One moment, Your Honor. Court's

20  indulgence.

21  No further questions, Your Honor.

22  **THE COURT:** Okay. Government, do you want to ask?

23  **MR. BARROSO:** Yes, Your Honor.

24

25

1          CROSS-EXAMINATION

2    **BY MR. BARROSO:**

3    **Q.**  Agent, how many cases are you investigating at this

4    moment?

5    **A.**  Right now, over 15 cases.

6    **Q.**  And I ask you, at your office -- at the United States

7    Attorney's Office, sometimes we have "go bys"; do you know

8    what that is?

9    **A.**  I do.

10   **Q.**  What is that?

11   **A.**  They are reports that we request from our co-workers.  In

12   this case, I'm a task force member, so I ask the federal

13   agents for a "go by," a report that they have prepared similar

14   to the investigation that I'm conducting.

15   **Q.**  You don't type up every report from scratch; do you?

16           **THE INTERPRETER:**  Could you repeat the question?

17   **BY MR. BARROSO:**

18   **Q.**  You don't type up every report from scratch; do you?

19   **A.**  No.

20   **Q.**  So some of them are bound to come out with typos; am I

21   right?

22   **A.**  Yes.

23   **Q.**  And that name, Nicolas Peña Vélez, is that a typo in that

24   report?

25   **A.**  That's a mistake that I made, yes, apparently I just

1   didn't eliminate that information, the Peña information.

2   **Q.**  Peña Vélez has nothing to do with this case at all, does

3   he?

4   **A.**  No.

5   **Q.**  It was just a mistake in the document?

6   **A.**  Correct.

7            **MR. BARROSO:**  No further questions.

8            **THE COURT:**  So, Agent, you're excused.

9   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         REPORTER'S CERTIFICATE

2

3            I, ZULMA M. RUIZ, Official Court Reporter for the

4    United States District Court for the District of Puerto Rico,

5    appointed pursuant to the provisions of Title 28, United States

6    Code, Section 753, do hereby certify that the foregoing is a

7    true and correct computer-aided transcript of proceedings had

8    in the within-entitled and numbered cause on the date herein

9    set forth; and I do further certify that the foregoing

10   transcript has been prepared by me or under my direction.

11

12

13

14

15

16
                               S/Zulma M. Ruiz
17                    _____

18                        Official Court Reporter

19

20

21

22

23

24

25